STEWART, J.
|/The plaintiff, Everline King, individually and on behalf of the estate of her father, Leon Nelms, obtained a jury award totaling $1,000,000.00 ($750,000 in damages for medical malpractice and $250,000 in general damages for negligence) against the defendant, Brown Development Inc., D/B/A Olive Branch Senior Care and D. Brown Enterprises, Inc. Though the trial court reduced the jury’s malpractice award to $500,000 in accordance with the statutory damages cap set forth by La. R.S. 40:1299.42(B)(1) of the Medical Malpractice Act (“MMA”), the Patient’s Compensation Fund (“PCF”) intervened by filing a motion for judgment notwithstanding the verdict (“JNOV”), or alternatively, for re-mittitur. The trial court granted the PCF’s motion and reduced the damages for malpractice to $200,000. Ms. King’s appeal requests reinstatement of the malpractice award to the fullest amount allowable under the MMA. In answer to the appeal, the PCF seeks further reduction of the award and the setting of interest in accordance with La. R.S. 13:5112(C).
Because we find that the trial court was manifestly erroneous in reducing the jury award below the statutory cap, we reverse the JNOV and reinstate the award to allow a judgment against the PCF of $400,000. Legal interest on the award remains as set by the trial court.
FACTS
Liability is undisputed. Only the amount of damages is at issue. The record shows that Ms. King had a close and loving relationship with her father. In 2002, after Mr. Nelms was diagnosed with Alzheimer’s disease, Ms. King took him home to live with her. She provided daily *234 care for her |2father for two years. In May 2004, Mr. Nelms fell and broke his hip during a hospital stay. Thereafter, it became more difficult for Ms. King to continue to provide care for him on her own. Mr. Nelms required a feeding tube to ensure that he got enough nutrients and hydration. He had difficulties moving and talking. Ms. King testified that she set an alarm clock to go off every two hours to remind her to turn and reposition him. Still, he began to develop small pressure sores. When Ms. King and her father fell while she was trying to pick him up, she realized that placement in a nursing home had become necessary.
Mr. Nelms was 84 years old and weighed 133 pounds when he entered Olive Branch Senior Care on October 20, 2004. He had a small Stage II pressure sore, also referred to as a decubitus ulcer, on his left hip; the wound was described as “pink” and “healing.” Though Mr. Nelms suffered from various ailments, including Alzheimer’s disease, arthritis, seizure disorder, and hypertensive cardiovascular disease, he was not assessed by the defendant as being at the end stage of illness with six months or less to live.
Within 30 days of his admission to the nursing home; Mr. Nelms was hospitalized due to infected Stage IV pressure sores on both hips and dehydration. The pressure sore on his left hip measured 8x7 centimeters and that on his right hip measured 6x4 centimeters. There was no documentation by the defendant that Mr. Nelms had been repositioned every two hours as required by his care plan to prevent development of pressure sores. Mr. Nelms’s weight had plummeted by 11 or more pounds, [3and the nursing home had failed to inform Mr. Nelms’s physician of his weight loss as required by orders. The defendant had failed to provide Mr. Nelms with sufficient nutrients and fluids in his feeding tube to prevent malnutrition and dehydration. Mr. Nelms died on November 22, 2004.
Ms. King filed suit alleging the defendant’s negligence in providing nonprofessional custodial care to Mr. Nelms, particularly in supervising and managing the nursing home staff and in failing to clean him on a “daily basis ... after each incontinent episode so as to prevent urine and fecal contact with his skin for an extended period of time.” Ms. King also alleged medical malpractice related to the care provided by the defendant. Specifically, the petition alleged that the defendant failed to provide appropriate staff training; to properly assess, care for, and treat Mr. Nelms; to provide appropriate pressure relief by timely turning and repositioning him; to timely clean him; to provide him with appropriate hydration and nutrition; and to provide him with appropriate restorative care and range of motion.
Ms. King’s suit was tried over five days before a jury. The jury found that Mr. Nelms suffered damages because of the defendant’s failure to provide the care required by his condition and awarded survival damages in the amount of $250,000. The jury also determined that Mr. Nelms’s death was caused by the defendant’s failure to provide the care he required and awarded wrongful death damages totaling $500,000. Lastly, the jury found the defendant negligent in its failure to clean Mr. Nelms in a timely manner and awarded general damages totaling $250,000. The judgment | ¿rendered on December 11, 2007, recognized that the damages for medical malpractice are subject to the MMA’s statutory cap and reduced the award of $750,000 to the $500,000 cap.
After the judgment was rendered, the PCF intervened by filing a motion for JNOV, or alternatively for remittitur, to reduce the jury’s malpractice award. The *235 defendant filed a similar motion seeking reduction of the negligence damages.[1] The trial court granted both the PCF’s and the defendant’s motions for JNOV, reducing the medical malpractice wrongful death and survival awards to $100,000 each and reducing the negligence claim for failure to clean to $50,000.
Seeking an increase in the medical malpractice award against the PCF to $400,000 plus legal interest, Ms. King appealed. The PCF has answered the appeal to seek a further reduction of the malpractice award and to have prejudgment interest fixed at 6% in accordance with La. R.S. 13:5112.
DISCUSSION
JN OV — Wrongful Death and Survival Damages
A motion for JNOV is authorized by La. C.C.P. art. 1811 as a means of modifying the jury’s verdict on the issue of liability or damages, or both. Mahmood v. Cathey, 43,189 (La.App. 2d Cir.04/30/08), 981 So.2d 831. |sAt issue on a motion for JNOV is whether the jury verdict, as a matter of law, is supported by any legitimate or substantial evidence. Id. For the evidence to be insufficient as a matter of law, no valid line of reasoning and no permissible inferences could possibly lead a rational person to the conclusions reached by the jury. Id. Stated another way, if there is evidence opposed to the motion for JNOV of such quality and weight that reasonable and fair-minded people, in the exercise of impartial judgment, might reach different conclusions, the motion should be denied. Fox v. Lay-ton, 42,491 (La.App. 2d Cir.10/17/2007), 968 So.2d 302.
In considering a motion for JNOV, the trial court may not evaluate the credibility of witnesses, weigh the evidence, or substitute its judgment for that of the jury. Scott v. Hospital Service District No. 1 of St. Charles Parish, 496 So.2d 270 (La.1986); Mahmood, supra. All reasonable inferences or factual questions should be resolved in favor of the nonmov-ing party. Fox, supra. Though the scales are tilted in favor of the survival of the jury’s verdict, the trial court has a breadth of discretion which varies with the facts of each case. Mahmood, supra; Gibson v. Bossier City General Hospital, 594 So.2d 1332 (La.App. 2d Cir.1991).
In Fox, supra, this court addressed the law applicable to a motion for JNOV in the context of damages:
A JNOV is a procedurally correct device for raising or lowering an unreasonable damage award. When a trial court has determined that a JNOV is warranted because reasonable men could not differ on the fact that the award was either abusively high or abusively low, it must determine what is the proper amount of damages to be awarded. In making this determination, the trial court is not constrained as are the appellate courts to raising (or lowering) the award to the | ^lowest (or highest) point reasonably within the discretion afforded that court. Rather, the trial court should render a de novo award of damages based on its independent assessment of damages.
Fox, 42,491, p. 5-6, 968 So.2d at 306.
In reviewing a JNOV granted by the trial court, the appellate court must *236 determine whether the trial court was manifestly erroneous or clearly wrong. Mahmood, supra. In determining whether the trial court erred in granting a motion for JNOV, an appellate court uses the same criteria as did the trial court in granting the motion. Joseph v. Broussard Rice Mill, Inc., 2000-0628 (La.10/30/00), 772 So.2d 94; Cockerham v. LaSalle Nursing Home, Inc., 2006-10 (La.App. 3d Cir.5/3/06), 930 So.2d 239, writ denied, 2006-1391 (La.9/22/06), 937 So.2d 391.
Though the jury awarded damages, for medical malpractice totaling $750,000, the trial court’s judgment reduced that amount to $500,000 in accordance with the statutory cap under the MMA. See La. R.S. 40:1299.42(B). The PCF’s motion for JNOV was based on the jury’s award and not on the reduced amount in the judgment. Upon granting the JNOV, the trial court again reduced the malpractice damages to $200,000, almost a fourth of the jury’s award. We must determine whether the facts and inferences point so strongly in favor the PCF that reasonable persons could not differ on the fact that an award of $500,000 for survival and wrongful death damages is abusively high.[2]
|7The jury determined that the defendant’s failure to exercise the requisite amount of care required by Mr. Nelms’s condition caused him to suffer injury and caused his death. These findings have not been appealed. The record shows that Mr. Nelms entered the nursing home in a frail condition and suffering from various ailments, including Alzheimer’s disease and dementia, seizure disorder, chest pain, and gout. He had a pre-existing decubitus ulcer described in the admission record as Stage I and II on the left hip buttocks area measuring 2x4 centimeters. The basis for the PCF’s request for a reduction in survival damages was the argument that Mr. Nelms’s pain and suffering could be attributable to any of his pre-existing conditions and not merely to the defendant’s conduct in treating Mr. Nelms. However, the jury was asked to determine whether the nursing home’s care and treatment of Mr. Nelms caused him to suffer and incur damages, and then it was asked to award an amount of survival damages to compensate for suffering caused by the nursing home. The jury knew it was to consider only the suffering related to the treatment of the nursing home in making its award.
If there is even a scintilla of evidence showing any pain or suffering by a victim prior to his death, damages are warranted in a survival action. Gordon v. Willis Knighton Medical Center; 27,044 (La.App. 2d Cir.6/21/95), 661 So.2d 991, writ denied, 95-2776, 95-2783 (La.1/26/96), 6661 s So.2d 679; Robicheaux v. Adly, 2002-37 (La.App. 3d Cir.6/12/02), 827 So.2d 429, unit denied, 2002-2783 (La.2/7/03), 836 So.2d 100. The severity and duration of the injury preceding death are to be con *237 sidered in determining the quantum. Ro-bicheaux, supra.
In seeking a reduction of the wrongful death award, the PCF argued that Mr. Nelms’s elderly age and medical conditions limited the future love, affection, and support that he would have been able to provide to Ms. King. Damages for wrongful death are intended to compensate the victim’s beneficiaries for their loss following the victim’s death. Watkins v. Bethley, 27,554 (La.App. 2d Cir.11/1/95), 662 So.2d 839, writ denied, 95-2848 (La.2/2/96), 666 So.2d 1107. The elements considered in awarding damages for wrongful death include loss of love and affection, loss of services, loss of support, medical expenses, and funeral expenses. Watkins, supra; Gordon, supra.
Though Mr. Nelms was in poor health and had a preexisting pressure sore when he entered the nursing home, his condition quickly declined during his short stay (27 days) due to the defendant’s actions. Mr. Nelms’s preexisting pressure sore worsened to the point of becoming a Stage IV ulcer. He also developed a Stage IV decu-bitus ulcer on his right hip. Both became infected. There was testimony of the sores having a foul odor. Though Mr. Nelms’s care plan provided that he was to be turned and repositioned every two hours as part of the treatment to heal his small preexisting pressure sore and prevent further development, there was no documentation that the defendant followed the plan. He was also to be |skept clean and dry to prevent deterioration of his skin. The finding of negligence in the defendant’s failure to clean him indicates that this was not done as required.
Mr. Nelms lost over ten pounds due to malnutrition and dehydration. The defendant did not follow orders to notify Mr. Nelms’s physician of weight loss or gains of five pounds or more. Mr. Nelms had a feeding tube through which he was provided nutrients and liquids. He was totally dependent on the nursing home staff to ensure that he was provided with sufficient nutrients and hydration. Ms. King testified that she found the machine used to feed him turned completely off during one of her visits.
The record supports a finding the Mr. Nelms experienced pain and suffering caused by the defendant’s ill treatment of him. Considering the poor care provided by the defendant, the lack of documentation of complaints of pain in its records of Mr. Nelms’s stay is hardly convincing that he did not experience great distress or discomfort. Mr. Nelms’s family members who visited him in the nursing home testified that he was experiencing pain. They discerned his distress from his trembling and groaning. Dr. David Seignious, an expert witness in internal medicine and geriatrics, testified that a patient with dementia and Alzheimer’s would have the capacity to feel pain even though he may not be able to express what he feels. He described decubitus ulcers as painful wounds that are open breaks in the skin. The records from the hospital where Mr. Nelms spent the last days of his life show that he was on pain medication, including Tylenol, Demerol and Phenergan. While the defendant argues |inthat Mr. Nelms was on pain medication at his family’s urging, Mr. Nelms’s treating physician authorized the medication. It is unlikely that the pain medication would have been administered unless it was thought to be a valid or necessary medical treatment. It appears from the trial court’s judgment granting a JNOV that it accepted the defendant’s argument that there is little evidence of pain and suffering by Mr. Nelms and that pain medication was given to him based on the family’s perception that he was in some pain. However, the jury’s *238 verdict indicates that it found the evidence sufficient to establish that Mr. Nelms experienced significant pain and suffering caused by the actions of the defendant.
In summary, Mr. Nelms spent 27 days as a resident in the defendant nursing home during which time his condition deteriorated due to the defendant’s improper care. The record and all reasonable inferences support a finding that he experienced substantial pain and suffering as his condition worsened and while he lived out his final days on pain medication in a hospital. The fact that Mr. Nelms was suffering from ailments that made him unable to verbally express his suffering only makes his situation more lamentable. He was a helpless, elderly man totally dependent on care from the nursing home staff, which utterly failed in providing appropriate care and caused his injuries and death.
With regard to the wrongful death damages, the record establishes that Ms. King had a close and loving lifelong relationship with her father. She is a devoted daughter who took Mr. Nelms into her home to care for him when he could no longer live on his own. She shared daily life with |nhim for over two years, until his condition worsened to the point that she could no longer provide care for him at home. Ms. King made the agonizing decision to place her father in the defendant nursing home and trusted in the defendant’s promise that it would provide appropriate care for Mr. Nelms. Even when Mr. Nelms was a resident in the defendant nursing home, Ms. King visited almost every day. The defendant’s records show that Ms. King was a concerned and involved daughter. She was at her father’s side during his final days in the hospital. Ms. King testified about how she still misses her father and feels that she broke the promise she made to take care of him.
In granting a JNOV on the wrongful death damages, the trial court apparently accepted the defendant’s argument that Mr. Nelms’s advanced age and preexisting conditions limited his ability to provide love, support, and companionship for his daughter. However, this view of the evidence ignores the testimony of the loving and devoted relationship Ms. King had with her father and overlooks the great gratification and comfort that one can feel simply by having a loved one near, no matter his age or ailments. Unlike an adult child who maintains a close relationship with a parent by regular visits, Ms. King took her father into her home and provided care for him for two years, making him the center of her life for that time.
From our review of the record in light of the standards applicable to motions for JNOV, we find that the trial court erred in reducing the survival and wrongful death damages below the medical malpractice cap. The award of $500,000 as set forth in the trial court’s initial judgment isjj^not abusively high when considered in light of the legitimate and substantial evidence in the record and the trial court’s failure to resolve all reasonable inferences from the evidence in the plaintiffs favor. Though the evidence is such that reasonable persons could disagree as to the exact measure of damages, this means that the JNOV should not have been granted. Damages that seek to compensate for pain and suffering or for loss of love, affection and companionship cannot be measured with exactitude. Their determination is made by the trier of fact, whether judge or jury, and must reviewed for reasonableness keeping in mind that awards will fall within a wide range. While the $500,000 award may be viewed as falling in the upper end, we cannot say that the record provides no support for the award. For these reasons, we find that the trial court erred in granting the JNOV.

*239
Prejudgment Interest

The PCF contends that prejudgment interest should run at 6% pursuant to La. R.S. 13:5112(0). Awards of court costs and interest in suits against the state or its political subdivisions, including departments, boards, commissions and agencies, are governed by La. R.S. 13:5112. As to legal interest, La. R.S. 13:5112(0) provides:
C. Legal interest on any claim for personal injury or wrongful death shall accrue at six percent per annum from the date service is requested following judicial demand until the judgment thereon is signed by the trial judge in accordance with Code of Civil Procedure Article 1911. Legal interest accruing subsequent to the signing of the judgment shall be at the rate fixed by R.S. 9:3500.
ha A similar issue was raised and rejected in Lamark v. NME Hospitals, Inc., 522 So.2d 634 (La.App. 4th Cir.1988), writ denied, 526 So.2d 803 (La.1988), in which it was argued that the PCF should be considered a state agency for purposes of this statute. The court held that La. R.S. 13:5112 does not apply to reduce the interest rate on judgments in medical malpractice actions. Id., at 640. The court reasoned that a medical malpractice suit is against a health care provider. While the PCF pays some damages under the MMA, it is not a defendant. See also Williams on Behalf of Williams v. Kushner, 449 So.2d 455 (La.1984).
We concur with the rationale set forth in Lamark, supra. La. R.S. 13:5112 applies to suits against the state and its political subdivision. This matter is a suit against the defendant, a qualified healthcare provider. It is not a suit against the PCF. Therefore, La. R.S. 13:5112(0 does not apply.
CONCLUSION
For the reasons explained, we reverse the trial court’s judgment granting the PCF’s motion for JNOV and reducing the damages awarded for the plaintiffs survival and wrongful death claims below the statutory cap under the MMA. We hereby reinstate the trial court’s judgment setting the award of malpractice damages at $500,000. The PCF is ordered to pay its share, $400,000 plus legal interest.
REVERSED AND RENDERED.
CARAWAY, J., concurs in part and dissents in part with written reasons.

. The defendant paid Ms. King $119,012.33 in satisfaction of its portion of the medical malpractice award. The payment was acknowledged in a Partial Satisfaction of Judgment, which included Ms. King’s reservation of rights against the PCF for the remaining portion of the award.

. In Gladney v. Sneed, 32, 107 (La.App. 2d Cir. 8/18/99), 742 So.2d 642, writ denied, 99-2930 (La. 1/14/00), 753 So.2d 215, the PCF appealed seeking a reduction in damages. The jury had awarded the parents of the victim damages in the amounts of $550,000 and $325,000. The trial court’s judgment reduced these proportionally to meet the statutory cap. This court determined that the amount in dispute in the PCF’s appeal was that set forth in the judgment and not the amount of the jury's verdict. The reduced awards as set forth in the trial court's judgment were not found to be excessive and affirmed. Similarly in this matter, the trial court reduced the jury's verdict to the statutory cap, but the trial court did not indicate whether the awards for survival and wrongful death damages were reduced proportionally. With the malpractice damages having already been reduced by law, our focus on reviewing the granting of the JNOV is on whether an award of $500,000, as reduced by the trial court in accordance with the MMA, is unreasonable.