JENKINS, J.,
Dissenting with Reasons.
| ,1 respectfully dissent from the majority’s opinion affirming the trial court’s judgment. Rather, I find that the law when applied to the facts reveals that the trial court manifestly erred in its application of the “Rules of the Road,”[1] and therefore no reasonable basis existed for the trial court’s finding that the driver of the flatboat, Jerry Rodriguez, Jr., was 100% at fault for the collision. For the reasons discussed below, I would reverse the trial court’s judgment and assign 70% of the fault to Mr. Rodriguez and 30% of the fault to the defendants, Mark Walters, Sr., Perry Alexcee, Jr., and Auto Club Family Insurance Company, in solido.
DISCUSSION
Although the majority was of the opinion that the record contained ample evidence to support the trial court’s conclusion that Mr. Rodriguez was solely at fault for causing the accident which killed both him and his father, it is my opinion that this ruling is not supported by the plain language of the law. While the experts disagreed regarding the interpretation and application of the Rules, all of the experts agreed that the respective duties of the boaters in this case were governed |2by the Rules of the Road. However, I find that a plain reading of the rules renders the trial court’s finding absolving the defendants of any responsibility for the accident so implausible, internally inconsistent, and in contrast to the plain language of the Rules that it should be reversed.
The manifest error or clearly wrong standard demands great deference for the trial court’s findings; nevertheless it is this Court’s duty on appeal to review the record in its entirety for errors of fact and errors of law. La. Const. Art. V. §§ 5(C) and 10(B); Theriot v. Lasseigne, 93-2661 (La.7/5/94), 640- So.2d 1305. It has long been held that a “[a] finding is ‘clearly erroneous’ when although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed.” U.S. v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746, 766 (1948). See also, Stobart v. State, Through Dep’t of Transp. & Dev., 617 So.2d 880, 882 (La.1993); Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990).
Therefore, while it is true that questions of credibility — including that of experts— are for the factfinder and should not be disturbed upon review, that is not the case when an expert’s opinions are patently unsound. Lirette v. State Farm Ins. Co., 563 So.2d 850 (La.1990). In certain situations, documents or objective evidence may so contradict a witness’ story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact-finder would not credit the witness’ story; in these cases we may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Rosell v. ESCO, 549 So.2d 840, 845 (La.1989).
|SI therefore begin my examination by reviewing the evidence and the law in the context of the duty-risk negligence analysis to determine whether or not the trial court committed manifest error in finding the flatboat solely responsible for the collision. Under this analysis, four questions should be considered:
(1) Was the conduct in question a cause-in-fact of the resulting harm?
*878 (2) What, if any, duties were owed by the respective parties?
(3) Were the requisite duties breached?
(4) Was the risk, and harm caused, within the scope of protection afforded by the duty breached?
Lazara v. Foti, 02-2888, p. 3 (La.10/21/03), 859 So.2d 656, 659; Mart v. Hill, 505 So.2d 1120, 1122 (1987). If the answer to any of the elements of the duty-risk analysis is negative, then a party may be found free from fault. Williams ex rel. Williams v. Jones, 09-839, p. 5 (La.App. 5 Cir. 2/23/10), 34 So.3d 926, 930 (citing Lazara, 859 So.2d at 659).
A. Cause-in-Fact Analysis
The cause-in-fact element is generally a key determination in the duty-risk analysis. Vargas v. Continental Cuisine, Inc., 04-1029, p. 5 (La.App. 4 Cir. 3/30/05), 900 So.2d 208, 211; Boykin v. Louisiana Transit Co., Inc., 96-1932, p. 8 (La.3/4/98) 707 So.2d 1225, 1230. It tests whether the accident would or would not have happened “but for” the defendant’s substandard conduct. Boykin, 707 So.2d at 1230. However, in cases involving “concurrent causes” of an injury, “the proper inquiry is whether the conduct in question was a substantial factor in bringing about” the accident or injury. Perkins v. Entergy Corp., 00-1372, 00-1387, 00-1440, p. 8 (La.3/23/01), 782 So.2d 606, 611. The Louisiana Supreme Court has applied the test by determining that “each of the multiple causes played so [ important a role in producing the result that responsibility should be imposed upon each item of conduct, even if it cannot be said definitively that the harm would not have occurred ‘but for’ each individual cause.” Id., at pp. 8-9, 782 So.2d at 612 (quoting Graves v. Page, 96-2201, p. 9 (La.11/7/97), 703 So.2d 566, 570). A factor used in determining whether a cause is a substantial factor includes “whether the actor’s conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm.” LeJeune v. Allstate Ins. Co., 365 So.2d 471, 475 (La.1978) (quoting Restatement of Torts, 2d, Section 433(b)).
I agree with the majority that the accident was caused, at least in part, by the decision of Mr. Rodriguez to turn left into the Petain Lagoon. But for the flatboat’s turn left, the collision would not have occurred. Nevertheless, the duty-risk analysis requires Mr. Alexcee’s conduct to also be examined to determine whether or not his conduct, too, was a legal cause of the accident. I find that it was.
A careful review of the evidence leads to the inevitable conclusion that the decision of Mr. Alexcee to veer the BayStealth to the right of the lagoon set in motion a series of continuous forces which could and did result in the plaintiffs’ harm in this case. The preponderance of the testimony was that the BayStealth was located approximately 40 to 50 feet from the shoreline of the lagoon when Mr. Alexcee first spotted the flatboat turning left out of the cut. It was undisputed that the flatboat was closer to the shoreline than the BayS-tealth upon initial sighting. Based on Mr. Alexcee’s initial assumption that the flatboat would head straight across the lagoon and turn left to pass port-to-port, Mr. Alexcee throttled down two or three times while steering closer to the right, his starboard side of the lagoon. | ¡/This action brought him in closer proximity to the flatboat and placed the two vessels on a collision course. This fact is corroborated by the testimony of all three passengers who each testified that they first noticed the flatboat ahead after Mr. Alexcee began throttling down and hugging the shoreline. Accordingly, Mr. Alexcee’s decision to veer from his initial course of travel, and in *879 stead steer closer to the shoreline was a substantial factor that led to the collision.
In addition, to the extent that Mr. Alex-cee claims that the accident occurred because Mr. Rodriguez turned left into the port side of the BayStealth, this testimony conflicts with Mr. Alexcee’s prior testimony as well as the testimony of other witnesses because from all other accounts, the flatboat maintained its general left-turning course at all times prior to the collision. Rather, the overwhelming majority of the evidence suggested that it was Mr. Alex-cee’s decision to steer right and hug the shoreline that would have caused the flatboat to collide with the port side of the BayStealth.
Therefore, the actions of each vessel were a cause-in-fact of the collision.
B. Duty Analysis
The next inquiry involves the question of duty and asks whether the plaintiffs have any law — statutory, jurisprudential, or arising from general principles of fault — to support their claim. Faucheaux v. Terre-bonne Consolidated Govt., 92-0980 (La.2/22/98), 615 So.2d 289, 292. Whether or not a duty exists is a question of law for the court to decide based upon the facts and circumstances of the case as established in the evidence of record. Lemann v. Essen Lane Daiquiris, Inc., 05-1095, p. 7 (La.3/10/06), 923 So.2d 627, 633. Mathieu v. imperial Toy Corp., 94-0952 (La.11/30/94), 646 So.2d 318, 322. As previously stated, the parties agree that the respective duties of the boaters were governed by the Rules of the Road. Generally speaking, the Rules of the Road are applicable to “all vessels upon the inland waters of the United States.”[2]
I will begin by examining the duties which plaintiffs claim the BayStealth breached. I will then examine the duties the defendants claim the flatboat breached. Lastly, I will examine the relationship, if any, between the duties invoked under the Rules of the Road.

(1) Duty to Determine Risk

The plaintiffs argue that the defendants are liable for their damages because Mr. Alexcee failed to properly interpret the actions of the flatboat, and thereafter reacted inappropriately. Rules 7 and 8 of the Inland Navigation Rules[3] require the operator of a vessel to determine whether a risk of collision exists, and prescribes the actions that should be taken to avoid a collision. Plaintiffs’ expert, Mr. Clark, testified that Mr. Alexcee was required to reasonably interpret the actions of the flatboat, and if in doubt, was to make a major course alteration, stop his engine, or go in reverse. He was of the opinion that Mr. Alexcee’s failure to properly interpret the intentions of the flatboat, and his subsequent decision to veer right, is what caused the two vessels to align on a collision course. Defendants’ expert, Commander Cole, countered that a duty to stop or reverse would only exist where |7there was sufficient distance between the two vessels upon first sighting, such as in a crossing situation.
*880 Rule 7(a) provides that “[e]very vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists.” It further states, “If there is any doubt such risk shall be deemed to exist.” Subsection (c) additionally provides: “Assumptions shall not be made on the basis of scanty information.”[4]
The plaintiffs specifically claim that Mr. Alexcee violated Rule 8 by failing to make a major course alteration, to stop his engine, or to go in reverse. Rule 8, governing the action required to avoid a collision, comprehensively states:
(a) General characteristics of action taken to avoid collision. Any action taken to avoid collision shall, if the circumstances of the case admit, be positive, made in ample time and with due regard to the observance of good seamanship.
(b) Readily apparent alterations in course or speed. Any alteration of course or speed to avoid collision shall, if the circumstances of the case admit, be large enough to be readily apparent to another vessel observing visually or by radar; a succession of small alterations of course or speed should be avoided.
(c) Alteration of course to avoid close-quarters situation. If there is sufficient sea room, alteration of course alone may be the most effective action to avoid a close-quarters situation provided that it is made in good time, is substantial and does not result in another close-quarters situation.
(d) Action to result in passing at safe distance. Action taken to avoid collision with another vessel shall be such as to result in passing at a safe distance. The effectiveness of the action shall be eare-fully checked until the other vessel is finally past and clear.
(e)Slackening of vessel speed; stopping or reversing means of propulsion. If necessary to avoid collision or allow more time to assess the situation, a vessel shall slacken her speed or take all way off by stopping or reversing her means of propulsion.
|s(f) Early action to allow room for safe passage:
(1) A vessel which, by any of these Rules, is required not to impede the passage or safe passage of another vessel shall, when required by the circumstances of the case, take early action to allow sufficient sea room for the safe passage of the other vessel.
(2) A vessel required not to impede the passage or safe passage of another vessel is not relieved of this obligation if approaching the other vessel so as to involve risk of collision and shall, when taking action, have full regard to the action which may be required by the Rules of this part.
(3) A vessel the passage of which is not to be impeded remains fully obliged to comply with the Rules of this part when the two vessels are approaching one another so as to involve risk of collision.[5]
Based on the evidence submitted at trial, it is clear that Mr. Alexcee attempted to comply with Rule 8 by taking positive action as soon as he observed the flatboat coming out of the bend. In addition, the testimony is undisputed that he, in fact, slackened his vessel’s speed in an attempt to avoid a potential collision. At the same time, however, Mr. Alexcee arguably breached the duties imposed by Rule 8 to avoid small alterations of course or speed; to alter his course based on consideration *881 of sufficient sea room to his left; and to take action to avoid collision that would result in the two being able to pass each other at a safe distance.
Nevertheless, it is evident to me that the scope of the duties and the extent to which they can be considered a cause-in-fact of the plaintiffs’ injuries cannot be considered in a vacuum. Rather, it is immediately apparent upon reading Rule 8 in its entirety that the duty imposed under Rule 8 must be considered in the connection with other applicable Rules of the Road. For instance, subsection (f) which prescribes the early action that should be taken to allow for safe passage, distinguishes between the duties imposed upon each ship under this Rule. In particular, reference is made to the duties of the vessel “required not to Rimpede ... passage” versus the duties of the vessel whose passage “is not to be impeded.” In addition, subsection (a) states that any action taken to avoid a collision must be made with due regard to the observance of good seamanship.[6]
Therefore, I pretermit a full discussion of whether or not defendants breached a duty under Rule 8 which could be said to have been the legal cause of plaintiffs’ harm under the facts and circumstances of this case, pending a review of related Rules of the Road implicated by the facts of this case.

(2) Duty to Maintain a Proper Lookout

At trial, the defendants argued that Mr. Rodriguez was solely at fault, in part, because he breached his duty under Rule 5, also known as the “look-out rule.”[7] Rule 5 states:
Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision.
Mr. Alexcee and the other passengers on the BayStealth testified that the men on the flatboat were not paying attention to where they were going. While Mr. Howard was the only one who recalled actually seeing the men, the others testified that the flatboat was riding high in such a manner as to block them from the view of the men on the BayStealth. They also testified that they attempted to yell out to the men on the flatboat, but heard no response. In addition, Mr. Howard 1 mspecifically testified that he saw the Rod-riguezes looking in the opposite direction as they were coming out of the curve in their direction.
Based on the testimony presented at trial, the trial court was not clearly wrong in finding that there was sufficient evidence at trial to show that the operator of the flatboat breached its duty under the look-out rule.

(3) Duty to Stay Right

The defendants also argued that Mr. Rodriguez was solely at fault because he did not keep to the right of the lagoon. At trial, plaintiffs’ expert, Mr. Clark, countered that the “stay-right” rule only applies when two vessels are meeting in a *882 narrow channel under Rule 9[8] or in a head-on situation under Rule 14.[9] The defense expert, Commander Cole, disagreed. He explained that absent an agreement to the contrary, the Rules never contemplate a boat turning left in a meeting situation. Without citing to any specific “stay-right” rule, the trial court concluded that both vessels were under a duty to alter their courses starboard so that the two vessels could pass to the port side of one another. The trial court concluded that Mr. Alexcee attempted to do this, and Mr. Rodriguez did not; therefore it found Mr. Rodriguez to be solely at fault for the collision.
Because it is unclear whether or not the trial court found that the duty to stay right emanated from Rule 9, Rule 14, or from an all-encompassing general rule to stay right, as argued by the defense, in order to determine whether or not the trial court committed manifest error in finding that the flatboat violated a duty to stay right, this Court should examine the Rules of the Road in their entirety to properly | n ascertain the scope of the duty to stay right and its application to the facts of this case. In other words, is there a general duty, as the defendants argued, to always turn right absent an agreement to the contrary?
For the reasons discussed below, it appears that no such general, all-encompassing rule exists. Rather, the duty to stay right is found in Rules 9 and 14 of the Inland Navigation Rules.
Rule 9, also referred to as the “Narrow Channels” rule, states in pertinent part:
A vessel proceeding along the course of a narrow channel or fairway shall keep as near to the outer limit of the channel or fairway which lies on her starboard side as is safe and practicable.[10]
At trial, the plaintiffs argued that Rule 9’s stay-right rule did not apply because there was no judicial determination that the Petain Lagoon was, in fact, a narrow channel. Defendants’ expert, Commander Cole disagreed, stating, “That’s irrelevant. The Narrow Channel Rule says that vessels should stay at the right-hand side of the channel whenever possible.” (Emphasis added).
Courts have traditionally found that whether or not a body of water can be considered a narrow channel is a mixed question of law and fact based not only on the physical dimensions of the body of water, but also the character of navigational use. See e.g., Marine Transp. Lines v. M/V Tako Invader, 37 F.3d 1138, 1142-43 (5th Cir.1994); Canal Barge Co., Inc. v. China Ocean Shipping Co., 770 F.2d 1357, 1362 (5th Cir.1985). Moreover, under the plain language of this rule, the duty to stay right would apply where there is evidence that (1) a vessel is located in a narrow channel or fairway and is (2) proceeding along the course of that narrow | ^channel or fairway. In addition, a vessel bound by this rule should only proceed as close to their starboard shoreline “as is safe and practicable.”[11]
Assuming that the trial court found there to be sufficient evidence to show that the lagoon could be considered a “narrow channel,”[12] in order for Rule 9 to apply, it would still be necessary for the evidence to *883 show that the flatboat was proceeding, or about to proceed, “along the course” of the lagoon such that Rule 9’s stay-right rule would apply.[13] Here, Mr. Alexcee testified that he assumed the flatboat was turning into the lagoon to head back in the direction the BayStealth was traveling from. The witnesses consistently testified, however, that the flatboat was hugging the shoreline as it came out of the cut and into the lagoon. They also testified that the flatboat was at all times riding high, and the testimony was undisputed that this was an indication that the flatboat was traveling less than 15 mph. Plaintiffs’ expert further explained that a boat merely traversing through the lagoon would not have been expected to ride so close to the shallow shoreline. In addition, it is unclear how far the flatboat actually traveled along the course of the lagoon before the accident occurred. Because reasonable minds could disagree as to whether the flatboat’s left turn into the lagoon amounted to its “proceeding along the course” of the lagoon at the time of the collision, without more, I could not say that the trial court was plainly wrong in finding that Mr. Rodriguez breached a duty to stay right.
| ^Nevertheless, the Rules of the Road must be read in conjunction with one another.[14] Therefore, in considering whether or not the flatboat had a duty to stay right under the narrow channel rule, the trial court would have necessarily had to have also considered the fact that the flatboat would have had to cross the bow of the BayStealth in order to “stay right” and pass on the BayStealth’s port side of the lagoon. The defendants’ own expert, however, testified that it is always illegal to turn across the bow of another vessel. In addition, Rule 9(d),[15] which governs crossing a narrow channel or fairway, states in pertinent part:
A vessel shall not cross a narrow channel or fairway if such crossing impedes the passage of a vessel which can safely navigate only within that channel or fairway.[16]
(Emphasis added). Thus, to the extent that court found that Mr. Rodriguez breached a duty to “stay right” and pass the BayStealth port-to-port under Rule 8, that finding would be in direct conflict with the rule prohibiting a vessel from crossing the bow of another.
It is therefore necessary to determine whether the trial court could have found that the Mr. Rodriguez breached a duty to stay right and pass on the port side of the BayStealth under Rule 14. Rule 14, the “head-on situation” rule, states in pertinent part:
| M(a) Course alterations to starboard; port side passage. Unless otherwise agreed, when two power-driven vessels are meeting on reciprocal or nearly reciprocal courses so as to involve risk of collision each shall alter her course to *884 starboard so that each shall pass on the port side of the other.
(b) Existence of head-on situation. Such a situation shall be deemed to exist when a vessel sees the other ahead or nearly ahead and by night she could see the masthead lights of the other in a line or nearly in a line or both sidelights and by day she observes the corresponding aspect of the other vessel.
(c) Assumption that head-on situation exists in cases of doubt. When a vessel is in any doubt as to whether such a situation exists she shall assume that it does exist and act accordingly.[17]
Notably, an application of the plain language of Rule 14 to the facts and circumstances of this case leads to the same dilemma. That is, in order for the flatboat to have entered the lagoon to pass on the port side of the BayStealth, it would have had to cross in front of the BayStealth, a maneuver prohibited under Rule 9(d), and which defendants admit was prohibited.
More importantly, the facts do not support a finding that the vessels were traveling along reciprocal courses immediately prior to the collision as required by Rule 14. Instead, the testimony indicates that the flatboat was entering the lagoon from the cut located on the right side of the BayStealth, while the BayStealth was already traveling along the course of the lagoon.
Lastly, to the extent that the defendants argue the existence of a general “stay right rule” or that Mr. Alexcee had the right to veer to his right due to existence of an in extremis situation, that argument still lacks merit. While some courts have found that good seamanship may require that all vessels keep right and pass port-to-port, that duty must still take into account the phrase, “when it is safe and practicable.” See Skibs A/S Siljestad v. S/S Mathew Luckenbach, 215 F.Supp. 667, 682 (S.D.N.Y.1963); see also, Maritrans, 800 F.Supp. 133, 140. Mr. Alexcee testified that immediately upon spotting the flatboat exiting the cut from his right, he immediately started navigating toward the right shoreline. He further testified that he “hit the mud” (presumably very shallow water) before the collision even took place. It would be a stretch to conclude that such a maneuver was safe or practicable and it is doubtful that the flatboat would have expected the 23-foot vessel to be traveling through the lagoon at a distance so close to the shore. Additionally, it would not have been “safe and practicable” for the flatboat to have crossed the BayStealth to pass port-to-port.
Since vessels are clearly prohibited from crossing each other’s bows, this review then begs the question: did the flatboat have a duty to stop and wait for the BayS-tealth to pass before attempting to turn left into the lagoon? Moreover, are there any rules that specifically govern the situation where two vessels are approaching each other from intersecting bodies of water, as was the situation here?

(4) Duty in a Crossing Situation

To answer these questions, it is necessary to consider Rules 15, 16, and 17,[18] which appear to be more closely applicable to the facts and circumstances in this case. Rule 15(a), governing “crossing situations” states:
(a) Vessel which must keep out of the other vessel’s way. When two power-driven vessels are crossing so as to involve risk of collision, the vessel which has the other on her starboard side shall keep out of the way and *885 shall, if the circumstances of the case admit, avoid crossing ahead of the other vessel.
| í RThis rule seems more applicable to the facts in this case because the undisputed evidence is that the flatboat was in the process of turning into the lagoon from an intersecting channel, or “cut” on the BayS-tealth’s right side.[19] In Guilbeau v. Calzada, 240 So.2d 104, 108 (La. 4th Cir.1970), we found that where two vessels were approaching each other from a 90-degree bend in the waterway, “the respective headings of the boats might more properly indicate a ‘crossing’ in which the vessel that has one on its starboard side is required to give way to the other.”
Applying Rule 15 to the facts herein, at the time when Mr. Alexcee first noticed the flatboat turning out of the cut, the flatboat was located to the starboard side of the BayStealth. Therefore, the BayS-tealth had the duty to “keep out of the way” and if possible “avoid crossing ahead” of the flatboat. According to the terminology used by defense expert, Commander Cole, the flatboat would have then been the “privileged vessel.” Furthermore, under Rule 16, the BayStealth, as the “give-way” vessel, had a duty to “keep out of the way of’ the flatboat and to “so far as possible, take early and substantial action to keep well clear.”
|17LastIy, Rule 17 states in pertinent part, “Where one of two vessels is to keep out of the way, the other shall keep her course and speed.”[20] Section (a)(ii) of Rule 17 further provides that “the latter [or privileged] vessel may, however, take action to avoid collision by her maneuver alone, as soon as it becomes apparent to her that the vessel required to keep out of the way is not taking appropriate action in compliance with these Rules.”[21] Moreover, “[w]hen, from any cause, the [privileged vessel] finds herself so close that collision cannot be avoided by the action of the give-way vessel alone, she shall take such action as will best aid to avoid collision.”[22] Of importance, Rule 17 states:
(b) Crossing situations. A power-driven vessel which takes action in a crossing situation in accordance with subparagraph (a)(ii) of this Rule to avoid collision with another power-driven vessel shall, if the circumstances of the case admit, not alter course to port for a vessel on her own port side.[23]
*886 (Emphasis added). In other words, in a crossing situation, the privileged vessel should try to avoid crossing for the purpose of passing port-to-port with a vessel originally approaching from its left. Based on this Rule, Mr. Alexcee was not justified in assuming that the flatboat would cross in front of the bow of the BayStealth to pass port-to-port, especially if, as defense expert suggests, an in extre-mis situation already existed when Mr. Alexcee first noticed the flatboat exiting the cut. Lastly, it provides that “[tjhis Rule does not relieve the give-way vessel of her obligation to keep out of the way.”[24]
|1sAn application of these crossing rules to Rules 7, and 8, discussed above, further supports the conclusion that the BayS-tealth should have slowed or stopped, while maintaining its course, rather than steering closer to its starboard side of the lagoon. Moreover, any deviation in course would more prudently have been to its left, since there was ample sea room to that side of the BayStealth and because that alternate maneuver would not have led to the close-quarters situation which resulted. I also find it particularly interesting that defendants’ expert, Commander Cole, admits that the BayStealth would have had a duty to slow, stop or reverse, if this were, in fact a “crossing situation,” although he denied that a crossing situation existed.
Finally, the defendants argue that they are immune from liability for their actions because this was an in extremis situation and under the rules, once a collision is imminent, all rules go away and the parties may take any action necessary to avoid a collision without fear of being held responsible for making a bad decision.[25] Rule 2, governing the responsibility of the parties, makes it clear that the defendants were not exonerated of the consequences of Mr. Alexcee’s decision to alter his course starboard under the circumstances of this case.[26] Rule 2 plainly states:
(a) Exoneration. Nothing in these Rules shall exonerate any vessel, or the owner, master, or crew thereof, from the consequences of any neglect to comply with these Rules or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.
11fl(b) Departure from rules when necessary to avoid immediate danger. In construing and complying with these Rules due regard shall be had to all dangers of navigation and collision and to any special circumstances, including the limitations of the vessels involved, which may make a departure from these Rules necessary to avoid immediate danger.
Thus, while vessels may deviate from the rules when necessary to avoid danger, such action does not result in automatic exoneration if the operator of a vessel makes a decision that still results in collision. The Florida District Court’s recent explanation of the in extremis rule in Tassinari v. Key West Water Tours, L.C, 2007 WL 1760928, p. 2 (S.D.Fla.6/18/07) (unpublished) is particularly helpful to this discussion:
The in extremis doctrine or “agony of the moment defense” applies when a ship is placed in sudden peril through no fault of its own and is forced to take “evasive maneuvers that may be a violation of a rule.” City of Chicago v. M/V *887 Morgan, 375 F.3d 563, 577 (7th Cir.2004) (citing 2 Thomas J. Schoenbaum, Admiralty & Maritime Law § 14-2 n. 49 (4th ed.2004)). “Normally, the law of collision assumes there will be a reasonable opportunity for decision, however, this assumption is abandoned in cases of sudden peril.” M/V Morgan, 375 F.3d at 578 (citing Richard J. Nikas, Skimming the Surface: A Primer on the Law of Collision, 9 U.S.F. Mar. L.J. 225, 240 (1996)). However, the in extremis doctrine “does not excuse a vessel making a wrong maneuver in extremis where the imminence of the peril was occasioned by the fault or negligence of those in charge of the vessel, or might have been avoided by earlier precautions which it was bound to take.” M/V Morgan, 375 F.3d at 577 (citing 70 Am.Jur.2d Shipping § 619 (2003)). Further, “applicability of the doctrine does not prevent a finding of liability, it merely requires courts to judge a captain’s reactions more leniently because of the crisis situation.” M/V Morgan, 375 F.3d at 577 (citing Grosse lie Bridge Co. v. American Steamship Co., 302 F.3d 616, 625-26 (6th Cir.2002)).
(Emphasis added). Accordingly, it is significant that Mr. Alexcee was duty-bound to take earlier action as the give-way vessel to avoid the collision, and was not justified in assuming that the flatboat would cross his path to pass port-to-port.
| 2qFor the reasons stated above, I believe that the BayStealth, as the give-way vessel, breached a duty to properly interpret the actions of the flatboat and react accordingly by altering its course to avoid a close-quarters situation and/or by stopping or reversing. In addition, to the extent that the trial court found that the flatboat breached a duty to “stay-right” because it should have crossed the path of the BayS-tealth and passed port-to-port, that ruling was also clearly erroneous.
C. Scope of Duty Breached
This court has explained the scope of duty in Chaisson v. Avondale Industries, Inc., 05-1511, p. 24 (La.App. 4 Cir. 12/20/06), 947 So.2d 171, 188, as follows:
The legal causation or scope of duty inquiry “assumes a duty exists and questions whether the injury the plaintiff suffered is one of the risks encompassed by the rule of law that imposed the duty.” Roberts v. Benoit, 605 So.2d 1032, 1044 (La.1991). The Louisiana Supreme Court stated that there is “no ‘rule’ for determining the scope of duty.” Id. Scope is “ultimately a question of policy as to whether the particular risk falls within the scope of the duty.” Id. Determining whether a harm is within the scope of duty is also very fact intensive. Roberts, 605 So.2d at 1045. “[Ljogic, reasoning and policy decisions” help the court to determine if liability exists according to the particular facts and circumstances of the case. Id. Courts use foreseeability as a way of determining whether a harm is encompassed within a duty. Id. However, the ease of association doctrine is also employed. Roberts, on rehearing, stated that the ease of association doctrine includes policy considerations as well as the element of foreseeability. 605 So.2d at 1054. The Court stated that factfin-ders should ask: “[i]s the harm which befell the plaintiff easily associated with the type of conduct engaged in by the defendant?” Id.
I find that the duty of Mr. Alexcee to properly interpret the actions of the flatboat in a crossing situation and to act accordingly was meant to protect the men on the flatboat from the harm that befell them. Unfortunately, both men on the *888 flatboat died in the collision. Therefore, the trial court was not able to hear their testimony as to how the collision occurred or whether they saw the BayStealth in the lagoon | ⅞1 prior to the time the men in the BayStealth noticed the flatboat and changed course to the right. If, for instance, Mr. Rodriguez had observed the BayStealth beforehand, he was arguably well within his right to turn left into the lagoon with the expectation that the BayS-tealth would not take subsequent action that would align the two on a collision course. It is therefore easy to conclude that the harm that befell the Rodriguez men was within the scope of protection afforded by the duties breached by the BayStealth as the give-way vessel.
D. Fault
Having found that both vessels breached duties imposed upon them pursuant to the Rules of the Road, the next step is to consider the factors to be applied in assigning the parties’ respective degrees of fault. In an action for injury or loss, the comparative fault of all persons contributing to an injury must be determined, including those suffering injury or loss. La. Civ.Code art. 2323. To determine the apportionment of fault, a court should consider the conduct of each actor and the extent of the causal relation between their conduct and the damages. The factors to be considered include: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. In addition, as evidenced by concepts such as last clear chance, the relationship between the negligent conduct and the harm to the plaintiff should be considerations in determining the relative fault of the parties. Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985).
192I find it to be extremely significant that Mr. Alexcee was at all times aware of the presence of the flatboat and attempted to take action to avoid the collision. There is no evidence to suggest that he was at any time, unaware of the danger; rather by insisting on port-to-port passage, he breached his duty under the plain language of the Rules of the Road in attempting to avoid the danger. In addition, by hugging closer to the shoreline, in the direction that the flatboat was already headed, there is no doubt the BayStealth significantly increased the risk of collision and it was arguably this maneuver which placed the two boats on a collision course.
Nevertheless, the evidence also supports a finding that Mr. Rodriguez’s inattentiveness played a significant role in the collision. In fact, there is no evidence to indicate that the flatboat, at any time, changed courses or tried to steer out of the path of the BayStealth to avoid the collision. I also find that the risk taken by the BayS-tealth would arguably have been minimized had they been able to get the attention of the flatboat. At that point, the men on the flatboat could have more clearly signaled their intentions to the BayStealth.
Because I find it to be significant that Mr. Alexcee was ultimately trying to avoid a collision, and was forced to act in haste and without a lot of time to properly assess the situation, I find that his fault was considerably less than the fault Mr. Rodriguez, who was seemingly unaware of the danger due to his apparent failure to maintain a proper lookout. However, I would not find — as did the majority — that the actions of Mr. Rodriguez superseded the fault of Mr. Alexcee such that the trial *889 court could have reasonably found negligence solely on the part of Mr. Rodriguez.
IgjBased on the foregoing, I believe that the trial court manifestly erred in attributing 100% of fault to Mr. Rodriguez based on the flatboat’s failure to stay right and keep a proper lookout. Instead, a portion of the fault should have been assigned to the defendants for Mr. Alexcee’s failure to properly interpret the actions of the flatboat and to react accordingly. When there is a finding that the trial court made a “clearly wrong” allocation of fault, this Court “should adjust the award, but only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court’s discretion.” Clement v. Frey, 95-1119, 95-1163, pp. 7-8 (La.1/16/96), 666 So.2d 607, 610-11. I would therefore find that the lowest reasonable percentage of fault that the trial court could have assessed to the defendants was 30%.
E. Solidary Liability
The parties stipulated to the fact that the BayStealth was owned by defendant, Mark Walters. The parties also stipulated that Mr. Walters had a policy of insurance provided by Auto Club Family Insurance Company that was in full force and effect at the time of the collision and that provided material coverage to him at all material times. Consequently, I would find that Mr. Alexcee, Mr. Walters, and the defendant insurance company are solidarity liable for any damages due to the plaintiffs as a result of the negligent operation of the BayStealth as a matter of law.
Mr. Walter’s liability stems from La. R.S. 34:851.18 which states, in pertinent part:
A. The owner of a watercraft shall be liable for any injury or damage occasioned by the negligent operation of such watercraft whether such negligence consists of a violation of the provisions of the statutes of lathis state or in the failure to observe such ordinary care in such operation as the rules of the common law require.
B. The owner shall not be liable, however, unless such watercraft is being used with his or her express or implied consent. * * *
At trial, Mr. Walters admitted that he gave Mr. Alexcee permission to operate the vessel because he was more familiar with the area where they were fishing. Mr. Walters is therefore solidarity liable with Mr. Alexcee for any damages to the plaintiffs because they are both obligated for the same damage. Williams v. Sewerage & Water Bd. of New Orleans, 611 So.2d 1383, 1388 (La.1993).
Mr. Alexcee and his insurer argue that La. R.S. 34:851.18 is inapplicable to the facts of this case because it is a penal, or criminal statute. Because there is nothing in the plain language of Section 851.18 to indicate that it is penal in nature, this argument is without merit. In fact, the statute speaks in simple terms of liability for negligence occasioned by the operator’s violation of state laws or the failure to use ordinary care, which was the case here. Instead, the defendants seem to be basing their position that Section 851.18 is criminal on the penal provisions found in La. R.S. art. 34:851.4, which governs the careless operation of vessels, rather than ordinary negligence.[27]
*890 I would find Auto Club Family Insurance Company liable based on its contractual relationship with Mr. Alexcee as his insurer. However, because the policy issued to Mr. Alexcee has specific language limiting the liability of the insurer, the insurer is only solidarity liable up to its policy limits. See e.g., Carrier v. Nobel Ins. Co., 01-0983, p. 13 (La.App. 3 Cir. 2/6/02), 817 So.2d 126, 136.
12r,That solidary liability should be applied to the facts of this case pursuant to La. R.S. 34:851.18, is also supported by well-established maritime law. Although under Louisiana Civil Code article 2324, solidary liability is usually limited to the situation where defendant debtors have conspired with one another to commit a willful or intentional act, that is not the rule in cases applying maritime law. It is well-settled that joint and several liability applies in maritime and admiralty cases when there has been a judgment against multiple defendants.[28] See e.g., McDermott, Inc. v. AmClyde, 511 U.S. 202, 114 S.Ct. 1461, 1465, 128 L.Ed.2d 148 (1994); Coats v. Penrod Drilling Corp., 61 F.3d 1113, 1124-30 (5th Cir.1995)(en banc) (“joint and several liability is the maritime rule”). Thus, even if there was a conflict between this State’s civil law and maritime law regarding the extent of exposure for joint tortfeasors, we would be nevertheless bound to apply maritime law’s solidarily liability rule. Hennegan v. Cooper/T. Smith Stevedoring Co. Inc., 02-0282, pp. 23-24 (La.App. 4 Cir. 12/30/02), 837 So.2d 96, 110-11; Mayo v. Nissan Motor Corp., 639 So.2d 773, 788-89 (La.App. 3 Cir.1994).
F. Damages
Appellate courts are authorized to render any judgment which is just, legal and proper where the trier of fact is clearly wrong in failing to do so and where the record contains sufficient proof of damages.[29] LSA-C.C.P. Art. 2164; Broussard v. Medical Protective Co., 06-331, p. 4 (La.App. 3 Cir. 2/21/07), 952 So.2d 813, 818. In making an initial award of damages, the appellate court is not limited to either l^the highest or lowest in the range of awards which we would have found on appeal. Rather, the award should represent an amount which is fair and just based on the damages sustained. Brous-sard, 952 So.2d at 818; Morris v. Owens-Illinois, Inc., 582 So.2d 1349 (La.App. 2d Cir.1991).
Mary Rodriguez testified that she had been married to the decedent for 42 years prior to the accident. They had three adult children: Jerry Rodriguez, Jr., age 41; Tammy Rodriguez-Cabrera, age 42; and Lisa Marie Rodriguez, age 29. She testified to a close and loving relationship with her husband and said they would do everything together. The two had never separated during the marriage. At the time of the accident, Mr. Rodriguez had been working with his son doing special event parties. Mrs. Rodriguez had planned to retire at the age of 62; however she continued to work at the age of 65 *891 because she needed the extra income once provided by her husband.
Ms. Rodriguez testified that her husband would do a lot of things to help out his daughters, especially repairing things. Lisa moved out of the home after graduating and then moved to Texas following Hurricane Katrina when her job transferred her there. She moved back to Louisiana after her father’s death to take care of her mom. Lisa testified to having a close relationship with her parents. They helped pay for her to attend LSU and continued to help her out financially when needed. She also explained that she moved back to help her mom because it was the right thing to do and because “family comes first no matter what.” She said that there is not a second that goes by when she does not miss her father.
127Tammy also testified at trial to a close and loving relationship with her father, whom she said she loved tremendously. She lived at home with her parents until she was 22 years old and they paid for her education. She lived five minutes away from her parents and visited them “all the time.” She explained that her father came to visit a lot and helped them with everything, including finances and repairs to their home and car. He was working to repair hurricane-related damage to her bathroom the night before he died and explained that her husband “cannot bring himself to finish where they left on.”
Damages for wrongful death are intended to compensate loved ones for their loss following the victim’s death. Turner v. Lyons, 03-0186, p. 11 (La.App. 4 Cir. 1/28/04), 867 So.2d 13, 21. Elements of damages for wrongful death include loss of love and affection, loss of services, loss of support, medical expenses and funeral expenses. Id.
After reviewing the record, I would award Ms. Mary Rodriguez $250,000 for the loss of her husband. I would also award Mr. Rodriguez’s two adult daughters $125,000 each for their own wrongful death claims. I believe that these amounts are just and fair based on the evidence adduced at trial.
Survival damages provide compensation for the damages suffered by the victim from the time of injury to the moment of his death; they differ from wrongful death damages, which compensate beneficiaries for their own injuries suffered from the moment of the victim’s death and thereafter. Warren v. Louisiana Medical Mut. Ins. Co., 07-0492 (La.12/2/08), 21 So.3d 186; Taylor v. Giddens, 618 So.2d 834 (La.1993). Damages for a survival action may include the decedent’s pre-impact fear. See Thomas v. State Farm Ins. Co., 499 So.2d 562 (La.App. 2d Cir.1986). Moreover, if there is even a scintilla of evidence showing any pain or suffering by a victim prior to his death, damages are warranted in a survival action. King v. Brown Development, Inc., 43,827 (La. App.2d Cir.2/4/09), 4 So.3d 231.
It is unclear from trial how long Mr. Rodriguez actually survived after the collision occurred, however, the autopsy report submitted as evidence revealed that he sustained multiple lacerations and abrasions to his face, scalp, and extremities; fractured ribs and sternum; lacerations to his aorta and vena cava; a punctured lung; and contusions of his lungs and chest wall. He also fractured his nose and spine. The autopsy also revealed immersion related fluid-filled lungs. It is unclear whether or not this is an indication that he may have died from drowning.
After the two boats collided, Mr. Alex-cee and his passengers noticed Mr. Rodriguez in the water but he was not moving. They waded in the water in an attempt to pull Mr. Rodriguez to safety but noticed *892 that he was already deceased. When they tried to pull the decedent into their vessel, his shoes fell off causing Mr. Alexcee to lose his grip. Mr. Rodriguez then sank back into the water.
Based on the foregoing, I believe that an award of $30,000 would be fair and just to compensate Mr. Rodriguez for damages suffered from the time of impact until his death. While it is unknown exactly how many seconds or minutes he lived following the accident, or whether he died from trauma or from drowning, survival damages have been sustained where a decedent lived for as little as one minute following injury. See e.g., Bourgeois v. Puerto Rican Marine Management, Inc., 589 So.2d 1226 (La.App. 4 Cir.1991).
^CONCLUSION
For the reasons discussed above, I would reverse the trial court’s judgment dismissing plaintiffs’ claim; award the plaintiffs wrongful death and survival damages totaling $530,000; and apportion fault for this accident at 30% to the defendants who are solidarity liable, and 70% to decedent’s son, Jerry Rodriguez, Jr., who is not named as a defendant in this litigation. Accordingly, I would render judgment in favor of plaintiffs, Mary Rodriguez, Tammy Rodríguez-Cabrera, and Lisa Marie Rodriguez and against defendants Perry Alexcee, Jr., Mark Walters, Sr. and Auto Club Family Insurance Company, based on my finding that they are liable in solido for the full sum of $159,000. This amount represents the total damage award to plaintiffs of $530,000, reduced pursuant to defendants’ comparative fault of 30%.
BONIN, J., Dissents for the Reasons Assigned by JENKINS, J.

. 33 C.F.R. part 83 (formerly, Inland Navigational Rules of 1980, 33 U.S.C. §§ 2001-2038).

. See Rule 1 of the Inland Navigation Rules, 33 C.F.R. § 83.01. See also, Milstead v. Diamond M Offshore, Inc., 95-2446 (La.7/2/96), 676 So.2d 89, 94, wherein the Court explained that state courts exercising concurrent maritime jurisdiction are usually bound to apply substantive federal maritime law and to follow United States Supreme Court maritime jurisprudence. On the issue of liability, because standards of review are procedural rather than substantive in nature, Louisiana courts of appeal are to apply the state manifest error standard of review in cases applying general maritime law under the "saving to suitors” clause. Id. at 95-97.

. 33 C.F.R. § 83.07-83.08.

. 33 C.F.R. § 83.07(c).

. 33 C.F.R. § 83.08.

. It has been said that navigation rules “are not a complete and comprehensive code of navigation, compliance with which is sufficient to avoid liability, but ..., on the contrary, the ordinary precautions of good seamanship, as defined by custom and case law, are still required.” G. Gilmore & C. Black, The Law of Admiralty § 7-11 at 509 (2d ed.1975).

. 33 C.F.R. § 83.05

. 33 C.F.R. § 83.09.

. 33 C.F.R. § 83.14.

. 33 C.F.R. § 83.09(a)(1).

. 33 C.F.R. § 83.09(a)(1).

.Courts have found bodies of water up to 1,000 feet wide to be narrow channels. See e.g. Maritrans Operating Partners L.P. v. M/T Faith I, 800 F.Supp. 133, 138 (U.S.Dist.Ct.N.J.1992), and cases cited therein.

. 33 C.F.R. § 83.09(a)(1).

. See e.g., Ransome v. Ransome, 2001-2361, p. 6 (La.App. 1 Cir. 6/21/02), 822 So.2d 746, 752, explaining:
Where it is possible to do so, it is the duty of the courts in the interpretation of laws to adopt a construction of the provision in question which harmonizes and reconciles it with other provisions. A construction of a law which creates an inconsistency should be avoided when a reasonable interpretation can be adopted which will not do violence to the plain words of the law and will carry out the intention of the lawmaker.

. 33 C.F.R. § 83.09(d).

. Rule 9(d) further states, “The latter shall use the danger signal prescribed in Rule 34(d) if in doubt as to the intention of the crossing vessel.” The issue of whether or not proper danger signals were used is not before us on appeal.

. 33 C.F.R. § 83.14.

. 33 C.F.R §§ 83.15-83.17.

.The crossing situation was described in Maritrans Operating Partners L.P. v. M/T Faith I, 800 F.Supp. 133, 138 (U.S.Dist.Ct.N.J.1992) as follows:
A crossing situation exists when two vessels are approaching each other on steady courses which vary by one point or more. LoVuolo at 27; Trinidad Corp. v. S.S. Keiyoh Maru, 845 F.2d 818, 823 (9th Cir.1988); In re Ocean Foods Boat Co., 692 F.Supp. 1253, 1261 (D.Or.1988); A/S Skaugaas v. T/TP.W. Thirtle, 227 F.Supp. 281, 291 (D.Md.1964); The Corozal, 62 F.Supp. 123, 125 (S.D.N.Y.1944). It is not necessary that the vessels intend to cross each others paths, only that "the continuance of both vessels upon their courses should bring them into such proximity or under such conditions as would involve risk of collision.” The Tamanend, 40 F.2d 288, 290 (E.D.Pa.1929). The crossing rules only apply where the vessels can see each other. Zim Israel Navigation Co., Ltd. v. Special Carriers, Inc., 611 F.Supp. 581, 586 (E.D.La.1985); Borcich v. Ancich, 191 F.2d 392, 395 (9th Cir.1951).
But see, Lind et al. v. United States, 156 F.2d 231, 233 (2nd Cir.1946) ("all navigation rules presuppose that both vessels shall be in sight of each other, and can continually check each other's positions”).

. 33 C.F.R. § 83.17(a)(i).

. 33 C.F.R. § 83.17(a)(ii).

. 33 C.F.R. § 83.17(b).

. 33 C.F.R. § 83.17(c).

. 33 C.F.R. § 83.17(d).

. See e.g., Griffin v. LeCompte, 471 So.2d 1382, 1388 (La.1985). "Conduct in an emergency is not judged by the standard applied in ordinary situations.” (citing Furka v. Great Lakes Dredge & Dock Co., Inc., 755 F.2d 1085 (4th Cir. 1985)).

. 33 C.F.R. § 83.02.

. Of interest, La. R.S. art. 34:851.4 currently provides penal sanctions for the failure of a vessel to comply with requirements mirroring the Rules of the Road, including the rule that "when vessels are on paths that cross, the vessel on the left will yield right-of-way to the vessel on the right.” La. R.S. art. 34:851.4(A)(3) (2011).

. In Louisiana, the common law term "joint and several” is considered synonymous with the civil law term "in solido," or "solidary liability.” Johnson v. Jones-Journet, 320 So.2d 533, 536 (La.S.Ct.1975); Touchard v. Williams, 617 So.2d 885 (La. 1993).

. Based on the showing made to this Court, the plaintiffs did not present sufficient evidence to support an award for special damages. Kaiser v. Hardin, 2006-2092, p. 11 (La.4/11/07), 953 So.2d 802, 810 ("Special damages are those which have a ‘ready market value,' such that the amount of the damages theoretically may be determined with relative certainty”); see also Wainwright v. Fontenot, 00-0492 (La. 10/17/00), 774 So.2d 70.