# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 06-331

**ERNEST BROUSSARD, INDIVIDUALLY AND
ON BEHALF OF GRACE BROUSSARD, AND KEITH BROUSSARD,
INDIVIDUALLY**

**VERSUS**

**MEDICAL PROTECTIVE COMPANY AND DR. JOHN BURTON**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2004-3397
HONORABLE R. RICHARD BRYANT, JR., DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**BILLY H. EZELL
JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Oswald A. Decuir, Jimmie C. Peters; Marc T. Amy, Glenn B. Gremillion, and Billy H. Ezell, Judges.

Amy, J., dissents and assigns written reasons.

**REVERSED AND RENDERED.**

**John E. Bergstedt
The Bergstedt Law Firm
Post Office Box 1884
Lake Charles, LA 70602
(337) 436-4600
COUNSEL FOR DEFENDANT/APPELLEE:
Truck Insurance Exchange Company
Dr. John Burton**

**Todd A. Townsley**
**Townsley Law Firm**
**3102 Enterprise Boulevard**
**Lake Charles, LA 70601**
**(337) 478-1400**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
**Ernest Broussard**

**Edmund M. Thomas**
**6104 Line Avenue, Suite 4**
**Shreveport, LA 71106**
**(318)219-9888**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
**Ernest Broussard**

**EZELL, JUDGE.**

In this matter, the family of Grace Broussard appeals the decision of the trial court that Dr. John Burton met his required standard of care in treating her. They assert that the heart-related etiology for her presented symptoms should have been more fully investigated before her discharge from the emergency room. The jury hearing the case, after struggling to understand the required standard of care, found in favor of Dr. Burton. We find the jury's findings to be manifestly erroneous and accordingly, reverse and render judgment.

Grace Broussard presented to the emergency room of Christus St. Patrick Hospital around 2:00 a.m. on November 25, 2001, complaining chiefly of chest pain. She was sixty years old, a smoker, had previously undergone a hysterectomy, and had a dramatic family history of heart disease, with several of her family dying extremely young.[1] Accompanying her complaint of chest pains were complaints of nausea, vomiting, and diarrhea. She described her chest pain as "burning." Dr. Burton examined Mrs. Broussard and ordered an EKG, lab tests, and chest x-rays.

The EKG results noted: "Normal sinus rhythm[;] T wave abnormality, consider lateral ischemia[;] Abnormal ECG." Dr. Burton confirmed that the EKG readings could be consistent with cardiac ischemia.[2] Dr. Burton noted a differential diagnosis of "gastroenteritis, angina, CW pain." Based on the complaints of nausea, vomiting, and diarrhea, and the outcome of the blood tests, Dr. Burton diagnosed Mrs. Broussard as having gastroenteritis and prescribed a GI cocktail for her symptoms. This eased her nausea, but her chest pain did not subside. Dr. Burton eventually gave

---

[1]Mrs. Broussard's father died of heart problems when he was 55. She also had five siblings, three sisters, and two brothers, die due to heart conditions between the ages of 36 and 42.

[2]Ischemia is a blockage of the blood vessels or coronary arteries that supply blood to the heart. This blockage reduces blood flow to the heart, can result in chest pain, and untreated, can lead to arrhythmia or heart attack.

1

her a shot of morphine for her pain. He recommended she follow-up with a cardiologist the next week. Mrs. Broussard was never given any aspirin or nitroglycerine for her chest pain. Mrs. Broussard was discharged from St. Patrick Hospital at 5:46 that morning.

Mrs. Broussard returned home with her husband, Ernest, who assisted in putting her to bed. When he attempted to wake her just before noon, he was unable to do so. Mrs. Broussard's death certificate lists the time of death as 7:00 a.m., just over an hour after she left the hospital.

Mr. Broussard filed this suit along with his son, Keith. Dr. Burton and his medical malpractice insurer were named as defendants. The Broussards allege that Dr. Burton failed to adequately rule out what they claim to be a deadly cardiac problem which led to Mrs. Broussard's death.

After twice seeking clarification as to the standard of care, the jury found in favor of Dr. Burton, stating that the Broussards failed to prove by a preponderance of the evidence that Dr. Burton deviated from the standard of care for an emergency room physician. From this decision, the Broussards appeal, asserting three assignments of error. They claim that the jury erred in failing to find that Dr. Burton breached the standard of care in the treatment rendered, that the jury erred in not finding that Dr. Burton's negligence contributed to Mrs. Broussard's death, and that the jury erred in failing to award damages as a result of the alleged malpractice. Because the first two assignments of error concern whether Dr. Burton was liable for medical malpractice, we will address them together.

## LIABILITY

Louisiana Revised Statute 9:2794 sets forth the burden of proof applicable to medical malpractice claims, providing, in part:

2

A.  In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., . . . the plaintiff shall have the burden of proving:

(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians . . . licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians . . . within the involved medical specialty.

(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.

(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

On appeal, a jury's determination is considered under the manifest error standard of review. *Martin v. East Jefferson Gen. Hosp.*, 582 So.2d 1272 (La.1991). We find the decision of the jury that Dr. Burton did not fail to meet his standard of care to be manifestly erroneous, unsupported by the record, and a result of jury confusion.

The jury instructions for the trial included a paragraph which read:

BASED ON THE BASIC RULES OF MEDICINE, DR. BURTON MUST RULE OUT ALL LIFE THREATENING ILLNESSES THAT A PATIENT'S SYMPTOMS COULD HAVE INDICATED.  PHYSICIANS ARE OBLIGATED TO RULE OUT THESE IMMINENT, SERIOUS AND LIFE THREATENING CAUSES FIRST. FAILURE TO ELIMINATE THESE CAUSES CAN SUBJECT A PATIENT TO A FORSEEABLE RISK OF HARM AND WOULD FURTHER CONSTITUTE A BREACH OF THE APPLICABLE STANDARD OF CARE.

We find this to be the correct, applicable standard of care, as was indicated by all experts in this case, including Dr. Burton.  While Mrs. Broussard presented with symptoms that could be diagnosed as indicative of problems other than cardiac in

3

nature, the simple fact of this case is that she presented with an abnormal EKG that indicated possible cardiac ischemia. This fact was known by Dr. Burton, and it was his duty to rule out this possible life-threatening condition before discharging her.

Dr. Larry Parker, an expert for the defense, testified that he saw the abnormal T Wave in the EKG done on Mrs. Burton. He testified that this should lead one to consider lateral ischemia. Furthermore, he stated that a positive test such as this has a 75% sensitivity, meaning a positive test is indicative of cardiac ischemia 75% of the time. He testified that differentiating between patients with benign conditions and those with life threatening ones is the most important responsibility in the emergency room. He stated that nausea and vomiting can be associated with cardiac ischemia and that while GI problems are unlikely to kill a patient, cardiac ischemia could kill within 24 hours.

Dr. Steven Hedlesky, another expert for the defense, also testified that nausea and vomiting can be consistent with cardiac ischemia. Mrs. Broussard described her chest pain by clenching her closed fist to her chest. Dr. Hedlesky noted that this is called a "Levine sign," and is an indication of tightness in the chest that can be associated with cardiac ischemia. He stated that an ST-depression, like the one presented by Mrs. Broussard's EKG, was a significant abnormality and should be "yielded more weight" when seen without an older EKG to compare it to. Moreover, when presented with a hypothetical patient who had the same family history, complaints of chest pain, and EKG readings as Mrs. Broussard, he stated that the treating emergency room physician should give nitrates and aspirin.

Dr. Burton himself admitted that he had no prior EKG to compare to Mrs. Broussard's EKG from that morning, and that because of this, he had to consider the fact that the cardiac ischemia could be acute. Dr. Burton also admitted that EKGs

4

indicating cardiac ischemia require a repeat EKG. He did not perform this second, admittedly required test. He agreed that medical textbooks state that indications of cardiac ischemia require treatment with nitroglycerine, aspirin, oxygen, and eventually morphine if pain does not subsist. He did not take any such action until Mrs. Broussard was administered morphine a mere fifteen minutes before her discharge. She was never given nitroglycerine or aspirin. He stated there was no reason not to give nitroglycerine to Mrs. Broussard, and that if she had responded well to it, he would have admitted her to the hospital. He further testified that had she been admitted to the hospital, she would have had a ninety percent chance of surviving her cardiac ischemia.

While he stated that the results of the blood work and chest x-rays led him to believe Mrs. Broussard was suffering from gastroenteritis, Dr. Burton testified that these tests *did not rule out* cardiac ischemia. In fact, Dr. Burton testified himself that Mrs. Broussard was discharged from the hospital without cardiac ischemia, a potentially life-threatening condition, being ruled out. This is the most damning testimony. Dr. Burton clearly admits that he breached the standard of care in failing to rule out a potentially life threatening condition prior to the discharge of Mrs. Broussard. Accordingly, we find that the jury, clearly confused by the instructions, committed manifest error in failing to find that Dr. Burton failed to meet the standard of care. We further find that this breach contributed to Mrs. Broussard's demise, as she would have had a ninety percent chance of surviving her ischemia had she been admitted to the hospital, according to Dr. Burton. Therefore, we reverse the decision of the jury and render judgment in favor of the Broussards.

## DAMAGES

Once it has been determined that the trier of fact is clearly wrong, the appellate court is empowered by LSA-C.C.P. Art. 216[4] to render

5

any judgment which is just, legal and proper. Courts of appeal may award damages when the trial court initially rejects plaintiff's demands and where the record contains sufficient proof of damages. In making an initial award of damages at the appellate level, we are not limited to an award of either the lowest or highest amount we would affirm. Instead, we set the award in an amount which is just compensation for the damages revealed by record.

*Gordon v. Willis Knighton Med. Ctr.,* 27,044 (La.App. 2 Cir. 6/21/95), 661 So.2d 991, 999, *writs denied*, 95-2776, 95-2783, (La. 1/26/96), 666 So.2d 679.

Louisiana Civil Code Article 2315.1 grants to designated beneficiaries a cause of action to recover the damages that a person suffered and would have been entitled to recover from a tort-feasor, if the person had lived. The survival action permits recovery only for the damages suffered by the victim from the time of the injury to the moment of death. The elements of damage for the survival action are pain and suffering, loss of earnings, and other damages sustained by the victim up to the moment of death. *Pierre v. Lallie Kemp Charity Hosp.*, 515 So.2d 614, 618 (La.App. 1 Cir.), *writ denied*, 515 So.2d 1111 (La.1987); La.Civ. Code art. 2315.1. Fright, fear, or mental anguish while an ordeal is in progress is also legally compensable. *Dawson v. James H. Stuart and Deaton, Inc.*, 437 So.2d 974 (La.App. 4 Cir.1983).

The record establishes that Mrs. Broussard feared for her cardiac health due to her extreme family history of the disease. She was extremely stressed during her stay in the emergency room, vomiting and suffering from diarrhea. She agonized in this fear, suffering from chest pain for over three hours. The Broussards ask for $50,000 in their survival action for this pain and anguish, and we find that to be an appropriate award. See *Gordon*, 661 So.2d 991.

The Broussards also seek damages for the wrongful death of Mrs. Broussard. The elements of damage for wrongful death are loss of love and affection, loss of services, loss of support, medical expenses, and funeral expenses. *Todd v. Sauls*,

6

94-10 (La.App. 3 Cir. 12/21/94), 647 So.2d 1366, *writs denied*, 95-0206, 95-0219 (La. 3/24/95), 651 So. 2d 289. The record establishes medical expenses in the amount of $2,665.16 and funeral expenses in the amount of $10,956.94. These amounts are hereby awarded to the Broussards. Additionally, Mrs. Broussard was working full time as a clerk at a drug store at the time of her death. Dr. Charles Bettinger found the loss of support Mr. Broussard suffered as a result of her death to be $178,812. This amount is also awarded to Mr. Broussard.

Finally, the record establishes close, affectionate relationships between Mrs. Broussard and both her husband and son. Mr. and Mrs. Broussard were married for forty-one years and had a loving union. He became depressed and withdrawn after her death. She was equally active and important in Keith's life, as well as those of his children and grandchildren. We hereby award Earnest Broussard $128,782.95 in wrongful death damages and Keith Broussard $128,782.95 in wrongful death damages.

The trial court also taxed the Broussards with the costs of the trial and expert witness fees in the amount of $500 each for the testimonies of Drs. Parker and Hedlesky. In accordance with our other findings in this case, we also reverse the award of these costs.

## DECREE

In accordance with the above reasons, the judgment of the trial court is hereby reversed. Judgment is hereby rendered in favor of the Plaintiffs as follows: $128,782.95 in wrongful death damages for Ernest Broussard; $128,782.95 in wrongful death damages for Keith Broussard; $50,000 for the survival action; $178,812 in loss of support and services; $10,956.94 in funeral expenses; and $2,665.16 in medical expenses. All awards are made with legal interest thereon from

7

the date of judicial demand until paid.  Costs of the trial, expert witness fees, and of this appeal are assessed against Dr. John Burton and Truck Insurance Exchange Company.

**REVERSED AND RENDERED.**

NUMBER 06-331

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

ERNEST BROUSSARD, INDIVIDUALLY AND ON BEHALF OF GRACE BROUSSARD AND KEITH BROUSSARD, INDIVIDUALLY

VERSUS

MEDICAL PROTECTIVE COMPANY AND DR. JOHN BURTON

AMY, J., dissenting.

Without question this is a tragic case, all the more so as we view the events in hindsight. Having said this, it is crucial to remember that the jury charged with deciding this case first heard the facts before concluding that the plaintiffs failed to establish their case. Even if this court might have decided those facts differently, it may not substitute its own judgment for that of the trier of fact absent manifest error. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). After reviewing the record, I do not find manifest error in the jury's determination. The trial judge found similarly in his denial of the plaintiffs' motion for new trial.

Simply, the parties presented the jury with two competing views of the evidence. The plaintiffs presented Dr. Howard Snyder and Dr. Christopher Martinez, both accepted as experts in the field of emergency medicine. Both testified that Dr. Burton breached the applicable standard of care in that a patient presenting with chest pain of the nature described and with an abnormal EKG, should be administered oxygen and certain medications, including nitroglycerin and beta-blockers. Dr. Snyder further stated that "the only way to exclude or rule out, . . . , a heart attack or cardiac ischemia with certainty is to admit the patient to the hospital, do a series of tests over 24 hours relatively speaking . . . ."

In opposition, Dr. Burton and his witnesses focused on whether Mrs.

Broussard's presentation indicated that an acute cardiac process or acute cardiac ischemia was underway. Dr. Burton testified that, while he found Mrs. Broussard's EKG abnormal, he saw no indication of an acute process. Rather, he explained that some individuals "just have abnormal EKGs, that's just the way that their electrical impulses show on their heart, and that's just the way some people's hearts are." Dr. Burton explained that, rather than relying solely on the EKG, he eliminated an ongoing acute coronary syndrome from his diagnosis based on, among other things, Mrs. Broussard's laboratory testing results and x-rays. He reviewed both of these for the jury and found neither revealed an acute cardiac process.

The jury also heard Dr. Burton review Mrs. Broussard's history and his physical exam insofar as they factored into his determination not to further pursue the possibility of a heart-related etiology of her symptoms. He testified that chest pain is one of the most common complaints in the emergency department and that Mrs. Broussard reported that her pain was better upon sitting rather than lying. Dr. Burton explained that cardiac ischemia is not usually positional in nature, but that improvement upon sitting is consistent with a gastrointestinal etiology. Also, while vomiting and nausea are not specific to any one condition and can be consistent with a heart-related process, Dr. Burton explained that diarrhea is not so related and is more indicative of an intestinal problem. Dr. Burton denied that oxygen was required for Mrs. Broussard as her pulse oximetry reading was within normal limits. He also denied finding Mrs. Broussard's breathing to be labored on examination. Finally, Dr. Burton testified that, upon physical examination, he recorded that Mrs. Broussard demonstrated "marked palpable tenderness" in the chest wall. He remarked that he underlined the term "marked" on his notes and that the area had been tender to the extreme as "just a light touch would elicit pain, and sitting up – I mean, she - - it

2

really created a lot of pain, a lot more than you would expect with just some little soreness from little muscular things." Dr. Burton distinguished this type of finding from "cardiac pain" which he noted was often difficult for patients to pinpoint. Given his findings, the laboratory testing results, and the x-rays, Dr. Burton determined that Mrs. Broussard was sufficiently stable for discharge. As noted on the discharge sheet, he felt that she should report to her cardiologist the following week.

The jury was also presented with the opinion of the Medical Review Panel wherein the panel unanimously concluded that Dr. Burton did not breach the applicable standard of care and made further findings favorable to Dr. Burton. The opinion provides, in part:

> The evidence does not support the conclusion that the defendant, *Dr. John M. Burton*, failed to comply with the appropriate standard of care as charged in the complaint.
>
> Responses to Specific Allegations:
> 1.    *Did Dr. Burton's failure to administer nitrates both to relieve her pain and to enable detection of a cardiac etiology of Mrs. Broussard's chest pain constitute a breach in the acceptable standard of care?* No.
>
> 2.    *Did Dr. Burton's failure to order telemetry monitoring of Mrs. Broussard constitute a breach in the acceptable standard of care?* No.
>
> 3.    *Did Dr. Burton's failure to consult a cardiologist when faced with an abnormal EKG and chest pain constitute a breach in the acceptable standard of care?* No.
>
> 4.    *Did Dr. Burton's failure to administer oxygen both to relieve her pain and to enable detection of a cardiac etiology of Mrs. Broussard's chest pain constitute a breach in the acceptable standard of care*? No.
>
> 5.    *Did Dr. Burton's failure to treat Mrs. Broussard's hypertension both as a precautionary matter and to enable a diagnosis of hypertensive angina constitute a breach in the acceptable standard of care*? No.
>
> 6.    *Did Dr. Burton's failure to admit Mrs. Broussard to a telemetry or intensive care unit for 24 hour monitoring and follow up*

3

*constitute a breach in the acceptable standard of care?* No.

> 7. *When faced with a patient with acute chest pain and cardiac risk factors who denies abdominal pain; did the diagnosis of gastroenteritis constitute a breach in the acceptable standard of care?* No.

> 8. *Did Dr. Burton's failure to order a repeat EKG and repeat cardiac enzymes prior to discharge of a patient with an abnormal EKG and chest pain that resolves only after the administration of Morphine constitute a breach in the acceptable standard of care?* No.

> This patient presented with symptoms that were consistent with a GI etiology, not a cardiac etiology. Dr. Burton prudently pursued a limited cardiac workup - adequate in our opinion - to satisfactorily exclude the likelihood of acute cardiac illness. The EKG and cardiac enzymes results are not consistent with pain of cardiac etiology of eight to nine hours duration. Also, the presence of frequent diarrhea is not consistent with the cardiac etiology of her symptoms, and the air fluid levels of the x-ray are consistent with the GI etiology of her symptoms. Finally, the cause of the patient's unfortunate demise was never determined.

> Additionally, we do not feel it is appropriate to retrospectively analyze the findings in the ER, based upon the knowledge of the patient's subsequent death.

Thus, the jury was presented with the concise findings of three experts who found unanimously that Dr. Burton responded appropriately given the presentation.

Moreover, the jury heard testimony at trial from two of the panel members, Dr. Larry Parker and Dr. Steven Hedelsky. Both physicians' views were consistent with Dr. Burton's assessment of Mrs. Broussard's symptoms and test results. Dr. Parker, a board certified family practitioner who limits his practice to emergency medicine, confirmed that the evidence did not support the conclusion that Dr. Burton failed to meet the applicable standard of care. Dr. Parker testified that both the EKG and the patient's complaints of pain must be considered together. Like Dr. Burton, he explained that Mrs. Broussard's description of her chest pain as "burning" in nature was consistent with a gastrointestinal problem as was the improvement of symptoms upon a positional change. Dr. Parker also referenced diarrhea as being "much more

4

likely on the gastrointestinal stomach side." Neither did he find that oxygen was required given the pulse oximetry reading. Summarizing other factors significant in the Medical Review Panel's evaluation, Dr. Parker referenced the abdominal x-ray suggesting a stomach etiology, the elevated white blood cell count suggesting an infection, and profuse diarrhea, vomiting, and nausea. He stated that: "[a]ll of these things, when you put them together, tend to suggest strongly this is a lady who's having a really bad stomach problem."

Dr. Hedelsky, a physician board certified in emergency medicine, also confirmed his view of the accuracy of the Medical Review Panel Opinion. He again found Mrs. Broussard's presentation more consistent with a gastrointestinal etiology and explained that, in his opinion, the EKG was normal for this patient. In response to questions regarding algorithms prescribing certain procedures based on a patient's presentation, Dr. Hedelsky distinguished lateral cardiac ischemia, the consideration suggested by the EKG, from cardiac ischemic pain. The former, Dr. Hedelsky explained, is a pathology, whereas cardiac ischemic pain is a symptom. He observed that "[m]ost chest pain is not unstable angina or angina or ischemic pain" and further confirmed that one can have ischemic changes that are not ischemic chest pain. Dr. Hedelsky explained that in assessing chest pain, the physician must speak with the patient in order to obtain the history and character of the pain, along with symptoms associated with it. He also stated that the physician must acquire the patient's risk factors and determine whether there are indications "of other illness processes that would exclude - - that would point you in a different direction and you have to take that whole clinical picture, and then along with that do whatever lab tests you think are appropriate with that clinical picture, and put those together." Dr. Hedelsky referenced the importance of Dr. Burton having performed a physical exam at the

time he was making his diagnosis as opposed to consideration based only on the medical records.

Obviously, the jury was called upon to consider conflicting witness testimony and opinion. In *Lasyone v. Kansas City Southern Railroad*, 00-2628, p. 11 (La. 4/3/01), 786 So.2d 682, 692, the supreme court observed that "it is well accepted that the trier of fact is charged with the determination of what credibility it assigns to expert witnesses and then to decide which expert among those testifying that it finds more credible." While the responsibility of credibility determinations rests with the trier of fact, an appellate court may find manifest error if documents or objective evidence "so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact-finder would not credit the witness's story[.]" *Sportsman Store of Lake Charles, Inc. v. Sonitrol Security Systems of Calcasieu, Inc.*, 99-021, pp. 6-7 (La. 10/19/99), 748 So.2d 417, 421. In the absence of such factors, however, "and [if] a fact-finder's determination is based on its decision to credit the testimony of one or two or more witnesses, that finding can *virtually never* be manifestly erroneous or clearly wrong." *Id.* (Emphasis added.)

In light of the above evidence, I find no manifest error in the jury's determination of the standard of care issue in favor of Dr. Burton. The plaintiffs attempted to prove that the standard of care required Dr. Burton to consider Mrs. Broussard's EKG as sufficiently suggestive of a cardiac-related etiology of her symptoms so as to require more extensive treatment. Notwithstanding its ability to reject this presentation outright, the jury was also presented with the defendant's expert testimony indicating that, at most, Mrs. Broussard's EKG suggested a non-emergent pathology which, when combined with the other circumstances of her presentation, led Dr. Burton to view her chest pain and symptoms in another light.

6

Dr. Burton's experts found this not to be a breach of the standard of care. Despite rigorous cross-examination, the defense experts' testimony was not so contradicted, internally inconsistent, or implausible that it was unreasonable to accept.

For these reasons, I conclude that the jury's determination was not manifestly erroneous. I respectfully dissent.