GRAVOIS, J. |tIn this survival action and wrongful death case, plaintiff Janet Cahanin, wife of the decedent Ronald Cahanin, brought suit against Dr. Ludwig Heintz, a general surgeon, for medical malpractice following the death of her husband hours after he underwent elective laparoscopic surgery to repair an inguinal hernia.[1] The jury found that Mrs. Cahanin proved the standard of care, that Dr. Heintz breached the standard of care, but that said breach was not a proximate cause of Mr. Cahanin’s death.[2] The trial court entered a judgment reflecting the jury’s verdict, dismissing Mrs. Ca-hanin’s suit against defendants with prejudice. Mrs. Cahanin moved for a judgment notwithstanding the verdict, which the trial court denied. Mrs. Cahanin now appeals, arguing that the jury’s conclusion that Dr. Heintz’s breach of the standard of care was not a proximate cause of her husband’s death was manifestly erroneous, and also that the trial court erred in denying her motion for judgment notwithstanding the verdict. Following a thorough review of the record in its entirety, as well as the applicable law, we find that the jury’s conclusion that Dr. Heintz’s breach of the standard of care was not a proximate cause of Mr. Caha-nin’s death is not reasonably factually supported by the record and is manifestly erroneous. Rather, for the reasons set forth herein, we find that Dr. Heintz’s breach of the standard of care was a proximate cause of Mr. Cahanin’s death. We accordingly reverse the judgment of the trial court and render judgment in favor of Mrs. Cahanin and against Dr. Heintz and his insurer, Louisiana Medical Mutual Insurance Company, in the amount of $500,000.00 in damages, plus interest and costs, as further explained below. I «FACTS AND PROCEDURAL HISTORY When he elected to undergo surgery to repair a hernia in 2012, Ronald Cahanin was 64 years old' and had a preexisting, blood disease called polycythemia vera (“PV”),[3] a myeloproliferative disease of the blood.[4] Its hallmarks are: (1) an over' production of red blood cells, making the blood thick and “sludgy” and increasing the risk of thrombolytic events, ie-., blood clots; and (2) an impairment in the function of platelets, which are responsible for blood clotting, putting sufferers at greater than the normal risk for bleeding. Mr. Cahanin had discovered that he had PY approximately two years before the hernia surgery. He was under the regular care of a hematologist, Dr. James Carinder, who managed Mr. Cahanin’s disease in two ways. To lower the risk of clotting, Dr. Carinder performed regular therapeutic phlebotomy, the taking of blood from Mr. Cahanin in an office procedure, which lowered the amount of red blood cells in his blood and which also made him mildly anemic, which in turn helped suppress the production of new red blood cells. Mr. Cahanin also took low dose (81 mg) aspirin on a daily basis, as well as Vitamin E, as part of Dr. Carinder’s treatment plan, which was described as another method of preventing blood clots. Dr. Carinder testified that in general, in a PV patient, the risk of blood clots is greater than the risk of bleeding, which is why they are treated with aspirin, a known anti-coagulant that also interferes with clotting. These two treatments, phlebotomy and aspirin,, managed the blood clot risk, but did not treat the bleeding risk. When it was discovered in late 2012 that Mr. Cahanin had an inguinal hernia, he elected to have it surgically repaired. He went to Dr.'Ludwig Heintz, a general surgeon who had previously operated on Mrs. Cahanin. The surgery was | ¡¡medically indicated because the hernia was symptomatic (painful).[5] A surgical consult appointment took place on November 29, 2012, at which time Mr. Cahanin informed Dr. Heintz about his PV and that he was under Dr. Carinder’s care. The surgery was scheduled for December 10,2012. Mr. Cahanin had a pre-operative appointment on December 4, 2012 at St. Tammany Parish Hospital. He had blood work done, and also informed Joy Porter, the nurse, that he regularly took, aspirin, vitamin E, fish oil, and Novase (blood pressure medicine). Believing that the aspirin was contraindicated for a surgical procedure, Ms. Porter contacted Dr. Heintz’s office to let the surgeon know that Mr. Cahanin was taking aspirin.[6] She spoke' with Rhonda Robertson, an employee of Dr. Heintz who assisted him with setting up surgical procedures and who was Ms. Porter’s regular contact at that office. Ms. Robertson testified that it was the office’s standard procedure to have patients discontinue aspirin use prior to surgery, a claim that Dr. Heintz denied at trial. She advised Ms. Porter-that the aspirin needed to be stopped, but this.was not an order: from a doctor and was not communicated to Mr. Cahanin. Dr. Heintz testified that-Ms. Robertson did not tell him that Mr. Cahanin was taking aspirin, nor did he know he was taking aspirin, despite it being in Mr. Cahanin’s pre-operative record in at least two places.[7] It is undisputed that Mr. Cahanin was not advised to discontinue taking the aspirin before the surgery and did not do so. Mr. Cahanin had an appointment with Dr. Carinder several days before the surgery, but did not tell him that he would be undergoing surgery in a couple of I ¿days. The record is undisputed that Dr. Heintz did not contact Dr. Carinder to ask for a surgical clearance for Mr. Cahanin and the two doctors did not communicate before the surgery.[8] The surgery was performed at St. Tammany Parish Hospital on December 10, 2012, from approximately 9:00-10:00 a.m. On the morning of the surgery, Mr. Cahanin' advised the nurse at the surgery intake that he had continued to take all of his medications, including the aspirin. Dr. Heintz reviewed the lab results taken at the pre-operative appointment, which; showed that Mr: Cahanin’s "white blood cell count was abnormally high, as well as several other lab values that were out of the range of normal. Mr. Cahanin' told Dr. Heintz'that his high white cell count was' typical, as was borne out by a later' review of Mr. Cahanin’s medical records. Dr. Heintz testified that he considered postponing the surgery based on Mr. Caha-nin’s lab work, but Mr. Cahanin elected to proceed with the surgery.[9] They did not discuss the issue of Mr. Cahanin’s aspirin use, because Dr. Heintz was not aware of it. • Mr. Cahanin’s surgery was performed without any difficulties. He was kept for standard post-operative observation, first in a post-anesthesia care unit, and thereafter in an ambulatory care unit. Upon the request of Mrs, Cahanin, Mr. Cahanin was kept a while longer than usual at the hospital because he looked a little gray, pale, and sweaty. However, he was discharged from the hospital around 3:00- in the afternoon, after being cleared by an anesthesiologist, who hád -reviewed his vital signs prior to discharging him. ' Upon discharge, Mrs. Cahanin brought her husband home and put him to bed, made him a sandwich for dinner, and left to fill his' prescriptions. When she returned, she noted that he had not eaten his sandwich. She gave him his |r,medicines and left him resting in their bedroom while she went into the den. She checked on him a few timéé, and later joined him and went to bed. Mr. Cahanin woke her up in the middle of the night, complaining of shortness of breath and that he did not feel well. She noticed that h'e was. very weak. She called an ambulance, which transported Mr. Cahanin to Lakeview Regional Medical Center, which was closer to their home than St. Tammany Parish Hospital, where the surgery had taken place earlier that day. When the ambulance arrived, Mr., Cahanin could converse with the EMTs, but his condition deteriorated during the transport, and he “coded” -on the ramp leading into the emergency room. A heartbeat was reestablished, although it appears that Mr. Cahanin did not regain consciousness at any point thereafter. He was treated in the emergency room by Dr. Julie Lawrence, who felt that Mr. Cahanin might be suffering a pulmonary embolism (blood clot in the lungs, or “PE”). She treated him with tissue plasminogen activator (“tPA”), which is a medicine to dissolve blood clots. Mr. Cahanin was transferred to the intensive care unit, coded again, and was revived a second time. Approximately six hours after he was brought to the emergency room, and approximately twenty hours after the surgery, Mr. Caha-nin expired. . An autopsy on Mr. Cahanin was performed by Dr. Michael DeFatta of the St. Tammany Parish Coroner’s Office. Dr. De-Fatta noted before he began the autopsy that the suspected cause of death was a PE. He accordingly dissected the blood vessels in the lungs “as far as we can possibly go” looking for evidence of clots, but could find none. However, he did find approximately two liters of blood in the retroperitoneal cavity in Mr. Cahanin’s abdomen, in the area of the surgical site and specifically where the mesh used to repair the hernia was present. He found that the mesh was properly placed and intact, and that no large blood vessels had been injured or cut during the surgery. He found no coronary artery blockages or past evidence of heart attacks. Mr. • Cahanin’s heart was enlarged, most probably 1 (¡from having high blood pressure, which Dr. De-Fatta said could have played a role in his death. He opined that Mr. Cahanin had died from bleeding out slowly, rather than from a PE. He allowed that the use of tPA in the emergency room might have caused a PE to dissolve, preventing him from finding it during the autopsy, though he considered it' unlikely that tPA would cause all evidence of a clot to disappear. He termed the death of “natural” causes because he felt that the excessive bleeding was caused by the PV, rather than an accident or injury, and the surgical procedure was performed correctly.[10] Mrs. Cahanin timely requested a medical review panel in accordance with- La. R.S. 40:1299.47 (now La. R.S. 40:1231.8). The panel determined that Dr. Heintz did not breach the standard of care. Mrs, Ca-hanin timely filed suit following the panel’s report. The matter proceeded to a jury trial in October of 20Í6, and on October 11, 2016, the jury rendered its verdict in favor of Dr. Heintz. A final written judgment confirming' the jury’s verdict was signed by the trial court on November 4, 2016, dismissing Mrs. Cahanin’s case. Mrs. Ca-hanin moved for a judgment notwithstanding the verdict, which was denied after a hearing. This timely'appeal followed. ANALYSIS To prevail on a medical malpractice claim, a plaintiff must prove three elements: (1) the standard of care applicable to the'healthcare provider defendant; (2) a breach of that standard of care; and (3) that the breach of the standard of care proximately caused the plaintiff to suffer injuries that would not otherwise have been incurred. See La. R.S. 9:2794(A). 17“The plaintiff need not show that the doctor’s conduct was the only-cause of harm, nor must all other possibilities be negated, but the plaintiff must show by a preponderance of the evidence that [the victim] suffered injury because of the doctor’s conduct. The test for determining the causal connection is whether the plaintiff proved through medical testimony that it is more probable than not that the injuries were caused by the substandard care.” Dumont v. Maaliki, 99-1850 (La. App. 1 Cir. 9/22/00), 769 So.2d 1230, 1232, quoting Hoot v. Woman’s Hosp. Foundation, 96-1136 (La. App. 1 Cir. 3/27/97), 691 So.2d 786, 789, writ denied, 97-165 (La. 10/3/97), 701 So.2d 209. “Under the manifest error standard of review, a factual finding cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. In order to reverse a fact finder’s determination of fact, an appellate court must review the record in its entirely and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. The appellate court- must not re-weigh the evidence or substitute its own factual findings because it would have decided the case differently. Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. However, where documents or objective evidence so contradict the witness’s story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based on a credibility determination. But where such factors are not present, and a fact finder’s finding is based on its decision to credit the testimony of one or two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.” Guy v. Bourgeois, 06-513 (La. App. 5 Cir. 11/28/06), 945 So.2d 161, 164, quoting Salvant v. State, 05-2126 (La. 7/6/06), 935 So.2d 646, 650. | ¡According to the jury interrogatories, the jury found that Mrs. Cahanin proved the applicable standard of care applicable to Dr. Heintz, and that Dr. Heintz breached that standard of care owed to Mr. Ca-hanin. The jury further found, however, that Dr. Heintz’s breach of the standard of care was not a proximate cause of Mr. Cahanin’s death. Mrs. Cahanin argues that this last conclusion was manifestly erroneous and not reasonably factually supported by the record. The injury complained of is Mr. Caha-nin’s death. The jury heard expert testimony that the cause of death was excessive bleeding. Dr. DeFatta, who performed the autopsy, opined that Mr. Cahanin died from excessive bleeding over time, as evidenced by the nearly two liters of blood that he found in Mr. Cahanin’s abdomen. He testified that this blood loss caused Mr. Cahanin to go into cardiac arrest. In his autopsy report, Dr. DeFatta did not relate the bleeding to negligence in the surgical procedure itself or the clot dissolving treatment Mr. Cahanin received in the emergency room. Though the initial cause of death was listed in the autopsy report as a pulmonary embolism, other expert physicians who testified at trial for Mrs. Cahanin (Dr. Thomas Gouge) and defendant (Dr. James Korndoffer)[11] generally agreed that Mr. Cahanin had not in fact suffered a PE, but had died from the bleeding described in Dr. DeFatta’s autopsy report.[12] This bleeding was described as a slow “ooze” over time, not a hemorrhage.[13] Evidence supports this fact, as Mr. Cahanin’s vital signs at the time of his discharge, around 3:00 p.m., did not indicate that he was bleeding, and he did not complain of feeling sick and having shortness of breath until around midnight when at home. Mr. |9Cahanin’s condition further deteriorated during the ambulance ride, resulting in him “coding” on the ramp into the emergency room. The jury interrogatories did not invite the jury to state specifically what they believed the standard of care required of Dr. Heintz was or in what particular way he breached it. Given that the jury found that the standard of care was in fact breached, and that this finding has not been appealed, our discussion of the expert testimony presented at trial is therefore limited to whether it provided a basis for the jury to conclude that Mr. Cahanin’s death was not resultant of a breach. In other words, this Court must examine the link between the proven medical negligence and the injury, Mr. Cahanin’s death. At trial, several acts or omissions in Dr. Heintz’s treatment of Mr. Cahanin were posited as evidence of negligence: one, the failure of Dr. Heintz to familiarize himself with the underlying disease process of po-lycythemia vera and its possible complications before the surgery; two, Dr. Heintz’s failure to consult with Mr. Cahanin’s hematologist, Dr. Carinder, before the surgery; and three, the failure to stop Mr. Cahanin’s aspirin regimen before the surgery. Mrs. Cahanin argued that’ each of these issues led to the need for Dr. Heintz to admit Mr. Cahanin overnight to the hospital for post-surgical monitoring for bleeding, which failure was ultimately the breach of the standard of care required of Dr. Heintz toward Mr. Cahanin. Had Mr. Cahanin been admitted overnight after the surgery for monitoring, Mrs. Cahanin argues, his slow bleed could have been detected prior to the point where his life was in danger, and could have been treated. In other words, the failure to admit Mr. Ca-hanin for overnight monitoring after the surgery led to his death by excessive bleeding, which is exactly one of the known increased |inrisks of'PV, as described by his treating hematologist, Dr. Carinder, as well as the other expert physicians who testified at trial.[14] The expert physicians who testified, as well as Dr. Heintz, testified that there is an inherent risk in all surgeries, for all patients, of blood clots and bleeding. The record contains no suggestion that there was any negligence on the part of Dr. Heintz’s performance of the procedure itself to cause Mr. Cahanin to continue to bleed post-operátively. Dr. Carinder testified that in general, “medically optimized” patients with PV are at a greater risk for both blood clots and bleeding following surgery, and more so for blood clots than bleeding.[15] Dr. Carinder testified that though he was medically optimized, Mr. Cahanin’s, risk of blood clots and bleeding was still greater than a patient without PV. Dr. Gouge, Mrs. Cahanin’s expert, and Dr. Korndoffer, defendant’s expert,' agreed.[16] Dr. Carinder testified that Mr. Cahanin was, in fact, at greater risk from ■a bleeding event than a blood clot, because his treatment of Mr. Cahanin had lowered. his hematocrit (the volume percentage of red blood cells in the blood), thus reducing his risk of blood clots. He 'Opined that Mr. Cahanin’s regular use of aspirin, which also reduced his risk of clots, rendered .him, particularly, at a greater risk of bleeding than of clotting. He testified that had Dr. Heintz consulted him, he would have advised that Mr. Cahanin stop his aspirin use prior to the surgery, and that he admit Mr. Cahanin overnight after the surgery to monitor him for bleeding.[17] He testified that an internal bleed can be easily rectified if caught in time. InThough Dr. Carinder testified that he would have stopped Mr. Cahanin’s aspirin use prior to the surgery, as did Dr. Gouge, he also agreed that in some cases, surgery can proceed despite the patient remaining on aspirin. The jury heard the defense expert physicians, Drs. Korndoffer and Frey, as well as Dr. Heintz, testify that it is not necessary to have all patients stop taking daily aspirin prior to a surgery. The testimony reflected that some doctors allow patients to continue on a daily aspirin regime prior to surgery, if the treatment is for a specific condition and not merely elective. Dr. Gouge testified that holding aspirin in a PV surgical patient is a matter of medical judgment, to be determined by consideration of the particular patient, but in cases where aspirin use was not stopped prior to surgery, the standard of care required having a post-operative plan that recognized the patient’s increased risk of bleeding, and that this plan included admitting the patient overnight to monitor the bleeding risk. He testified that the greatest risk of bleeding is in the first 24 hours after surgery. He believed that Dr. Heintz was negligent in failing to prescribe the proper post-surgical monitoring for bleeding, given Mr. Cahanin’s PV and use of aspirin as treatment, and that this negligence caused Mr. Cahanin’s death. Dr. Heintz testified that prior to the surgery, he felt he knew a lot about PV and did not need to consult Dr. Carinder, though he also admitted that prior to this lawsuit, he was familiar only with the general PV patient’s increased risk of clotting and not of the increased risk of bleeding. Prior to this case, he was not aware that PV patients were treated with aspirin therapy. He was also not aware that Mr. Cahanin was taking aspirin daily at the direction of Dr. Carinder, despite it possibly being on his office’s “pink sheet” and also in his pre-operative records in at least two places. He testified that prior to operating on Mr. Cahanin, he was unaware if he had ever operated on anyone with PV, but has since treated perhaps 11Ptwo patients with PV, although he also stated that he does not operate on patients with PV anymore. Dr. Heintz testified that had he consulted Dr. Carinder prior to the surgery, and had Dr. Carinder recommended stopping the aspirin and admitting Mr. Cahanin overnight for monitoring after the surgery, he probably would have done both. He did state, however, that had he looked in the patient record and had seen that Mr. Ca-hanin was taking aspirin, he would not have postponed the surgery on that basis alone, and would not have admitted him for monitoring on that basis alone, absent a recommendation from Dr. Carinder. The evidence in this record shows that Mr. Cahanin died.from a slow and progressive bleed that deposited approximately two liters of blood in his abdomen. This bleed occurred over time, until the blood loss caused Mr. Cahanin to go into cardiac arrest hours after his surgery. The evidence shows that Mr. Cahanin’s underlying disease, PV, made him at greater risk than a surgical patient without PV for prolonged bleeding due to the fact that his disease caused his platelets to not function properly. Dr. Gouge, Mrs. Cahanin’s expert who reviewed the medical records in this case, agreed that Dr. Heintz’s postoperative note, stating that he saw no active bleeding and that hemostasis was adequate, was correct. The problem, Dr. Gouge explained, was that in PV patients, the platelets do not function correctly and bleeding occurs slowly, over time, which could have been monitored in an overnight hospital stay. Dr. Gouge also did not challenge the time' of discharge observation that placed Mr. Cahanin’s blood levels within normal ranges, because again, he emphasized, the danger to PV patients is slow bleeding rather than hemorrhage. Drs. Korndoffer and Frey, experts for the defense, both testified that they considered being at home following surgery to be the equivalent of being monitored in a hospital overnight. Dr. Korndoffer stated that, there was no 11¡¡guarantee that the nurses would, in fact, cheek vital signs more than once every eight hours, even if specifically ordered by the surgeon to monitor more frequently. We find that Dr. Korndoffer’s speculation that nurses would have not followed specific orders given by a doctor is a conclusion unsupported by evidence.[18] We note, however, that such a conclusion places the actionable negligence on the nursing staff, rather than the surgeon, as there" was no suggestion in this récord that the surgeon’s’ duty extended past admitting the patient for monitoring and include^ performing that monitoring himself all night. In other words, concluding (without evidence) that the nursing staff would have been negligent if the patient had been admitted does not excuse the surgeon’s breach of the duty to admit the patient in the first place. . Upon review of the record in its entirety, as well as the applicable law, we find that the jury’s conclusion that Dr. Heintz’s breach of the standard, of care was not a proximate cause.of Mr. Cahanin’s death-is not reasonably factually supported by the record and is manifestly erroneous. Rather, we find that Dr. Heintz’s breach of the standard of care was a proximate cause of Mr. Cahanin’s injuries (death) that would not have otherwise occurred. Dr. Heintz’s .failure to educate himself about PV, whether by further research or a consult with Dr. Carinder, which résulted in his failure to have a post-operative plan specific to- Mr. Cahanin to monitor for postoperative bleeding, for which Mr. Cahanin was at greater risk than a normal patient, was the breach of the standard of care established by the evidence, and was clearly a proximate cause of Mr. Cahanin’s death. It appears that the jury may have been confused by the coroner’s classification of Mr. Cahanin’s death as of “natural” causes. Dr. DeFatta explained that he ruled the death as “natural” because the complication from the surgery, the | uexcessive bleeding, resulted from a natural disease process, the polycythemia vera, rather than an injury caused by the surgery, such as a punctured blood vessel or punctured bowel. He said that had the autopsy revealed such an injury as the source of the bleeding, the death would have been ruled accidental rather than natural. However, it is important to note that Dr. DeFatta’s classification of the death as “natural” does not address or rule out the role of physician negligence as a proximate cause or contributing factor in the death. In other words, Mr. Cahanin’s blood disease, not the surgery per se, was the cause of his bleeding, but his death (the complained of injury) was caused in part because Dr. Heintz failed to understand that Mr. Cahanin had a greater risk of prolonged bleeding because of his disease, and he did not have a post-operative plan to monitor Mr. Cahanin appropriately for the increased risk, which omission was a proximate cause of his death due to excessive bleeding over time. In brief, Mrs. Cahanin cites the case of Gust v. Brint, 577 So.2d 1012, 1022-23 (La. App. 4th Cir. 1991), in support of her position that the jury committed manifest error. We find the case pertinent and instructive. In Gust, the trier of fact found that Dr. Brint’s performance of eyelid surgery on a patient with known thyroid problems and physical manifestations of Graves disease was a breach of the standard of care, but that such breach did not cause the plaintiffs injuries. The court of appeal found that the trial court incorrectly understood the nature of the plaintiffs injuries, which was not the onset of Graves disease, but were the surgical complications which arose from the doctor’s failure to understand that the plaintiff had the underlying Graves disease. These complications arose because the surgeon did not understand the patient’s underlying disease process, and this lack of knowledge resulted in negligence, the failure in his duty to treat the patient appropriately. | lfiLikewise, in this case, Dr. Heintz was not accused of performing the surgery itself in a negligent manner, but rather he was charged with not understanding Mr. Cahanin’s underlying disease process and thus in failing to take the increased risk of bleeding into account when planning appropriately for Mr. Cahanin’s post-operative care. Accordingly, we find the jury’s conclusion that the breach of the standard of care was not a proximate cause of Mr. Cahanin’s death is manifestly erroneous and not reasonably factually supported by the record. We thus reverse the finding of the jury, and find that Mrs. Cahanin proved that Dr. Heintz’s breach of the standard of care was a proximate cause in Mr. Cahanin’s death. DAMAGES Having determined that the jury was clearly wrong, La. C.C.P. art. 2164 empowers this Court to render any judgment which is just, legal, and proper on the record. When the record is complete, the court of appeal is empowered, under La. C.C.P. art. 2164, to award damages. Pesses v. Angelica, 14-336 (La. App. 5 Cir. 11/25/14), 165 So.3d 131, 141 n.11 (citation omitted); Walker v. Corsetti, 04-784 (La. App. 5 Cir. 3/29/05), 900 So.2d 991, 997. When a factfinder does not reach an issue because of an earlier finding which disposes of the case, the appellate court, in reversing the earlier finding, must make a de novo determination of the undecided issues from the facts in the record. Clement v. Carbon, 13-827 (La. App. 5 Cir. 4/9/14), 153 So.3d 460, 465. Thus, when the trial court has made no award for damages because it found the accident did not cause the damages at issue, the appellate court must make an award that is just and fair based on a de novo review- of the record. Id Upon a de novo review of the record, an appellate court is not constrained to the lowest or highest amount reasonable for damages. Instead, the appellate court is empowered to award an amount which represents appropriate compensation for the damages revealed in the record. Id. (Internal citations omitted.) \irJ)amages for survival action At trial, Mrs. Cahanin sought damages for the survival action. “La. C.C. art. 2315.1 grants to designated beneficiaries a cause of action to recover the damages that a person suffered and would have been entitled to recover from a tort-feasor, if the person had lived. The survival action permits recovery only for the damages suffered by the victim from the time of the injury to the moment of death. The elements of damage for the survival action are pain and suffering, loss of earnings, and other damages sustained by the victim up to the moment of death. Fright, fear, or mental anguish while an ordeal is in progress is also legally compensable.” Broussard v. Med. Protective Co., 06-331 (La. App. 3 Cir. 2/21/07), 952 So.2d 813, 818. (Internal citations omitted.) In the present case, the testimony and evidence show that Mr. Cahanin’s duration of suffering attributable to the excessive unmonitored bleeding can be approximated from the time he awoke at home feeling short of breath until he arrived at the emergency room, when he became unresponsive, until the time of his death approximately six hours later. Mrs. Cahanin has suggested that $25,000.00 would be an appropriate amount of compensation for the survival action. Upon a de novo review of the record, considering the evidence as a whole, we find-this amount of compensation for the survival action ($25,000.00) to be just and fair and supported by the evidence.[19] Damages for wrongful death Mrs. Cahanin also seeks damages for the wrongful death of 'her husband, as per La. C.C. art. 2315.2. The elements of damage for wrongful death are loss of love and affection, loss of services, loss of support, medical expenses, and funeral expenses. Broussard v. Med. Protective Co., supra, 952 So.2d at 819. (Internal ^Jjjcitation omitted.) At trial, the parties jointly stipulated to the following special damages: $44,478.39 in Mr. Cahanin’s medical expenses, $1,845.75 for his funeral expenses, and $486,823.00 for loss of support for Mrs. Cahanin, as per the report of economist G. Randolph Rice, Ph.D., to which the parties also stipulated, for a total in special damages of $533,147.14. Accordingly, we find this amount of special damages to be just and fair and supported by the evidence.[20] Mrs. Cahanin, on appeal, as in her mo-? tion for judgment notwithstanding the verdict, asserts that $400,000.00 would be reasonable compensation for the loss of love, affection, and services. The evidence at trial showed that at the time of his death, Mr. Cahanin was 64 years old and had retired.[21] Mr. and Mrs. Cahanin had been married 39 years and had raised three children together, and had a grandchild, which gave them both great joy. They enjoyed his retirement together, spending much of the day with each other in leisure pursuits and socializing with friends and neighbors. Mr. Cahanin had always taken care of all of the bill paying and financial management of the household. After,he retired, he took over, other tasks from her. She described him as the family’s “emotional rock” when they faced issues such as a child’s divorce or illness. After Mr. Caha-nin died, one of their adult children accidentally drowned; Mrs. Cahanin described how hard it was to cope with that loss without Mr. Cahanin’s emotional support. Upon a de novo review of the record, considering the evidence as a whole, including the close, loving marital relationship Mr. and Mrs. Cahanin enjoyed throughout their marriage and Mr. Caha-nin’s life expectancy at the time of trial (stipulated to be 15,58 years past the date of trial), we find $400,000.00. in general damages to Ms. |1sCahanin for her past and future loss of love, affection, and services occasioned -by her husband’s' wrongful death to be just and fair and supported by the evidence.[22] Limitation of recovery: “cap” on damages The total amount recoverable for all malpractice claims for injuries to dr death of a patient, ¿xclusive of future medical care and related benefits as provided in La. R.S. 40:1231.3, shall not exceed five hundred thousand dollars, plus interest and cost. La. R.S. 40:1231.2(B)(1). Because they are not considered “future medical care and related benefits as provided in La. R.S. 40:1231.3,” funeral expenses, medical expenses, loss of support, and general damages are included within the $500,000.00 “cap.” Id. Accordingly, in accordance with La, R.S. 40:1231.2(B)(1), the total of damages in the amount of $958,147.14 we have found to be just and fair and supported by the evidence in this case must be reduced to $500,000.00, plus interest and costs. CONCLUSION F or the foregoing reasons, we reverse the trial court’s judgment and render judgment in favor of plaintiff, Janet Cahanin, against defendants, Dr. Ludwig Heintz and Louisiana Medical Mutual Insurance Company, in the amount of $500,000.00, plus interest and costs.[23] REVERSED AND RENDERED . Mrs. Cahanin also sued Dr. Julie Lawrence, an emergency medicine doctor who treated Mr. Cahanin in the emergency room. Also sued was Louisiana Medical Mutual Insurance Company, the insurer of both doctors. . At the close of Mrs. Cahanin's case, Dr. Lawrence was dismissed via the grant of her motion for directed verdict. Mrs. Cahanin did not object, and does not appeal this result. . Polycythemia vera is a condition characterized by an increased number of red blood cells in the bloodstream. Affected individuals may also have excess white blood cells and blood clotting cell fragments called platelets. These extra cells and platelets cause the blood to be thicker than normal. . Myeloproliferative diseases are a group of diseases of the bone marrow in which excess cells are produced. . The surgery was described as “elective” in the sense that it was not an emergency. Of the expert witnesses who offered an opinion on this issue at trial, all agreed that given Mr. Cahanin’s PV, it was better to do the surgery before it became an emergency. . The record reflects that Ms. Porter also contacted the anesthesiologist about the aspirin, but was.told it was not a problem from that perspective. .At trial, Mrs. Cahanin noted that the “pink sheet" from Dr. Heintz's office, which was the office form used by Ms. Robertson to record information from the patient taken at the preoperative appointment, and which presumably noted that Mr, Cahanin was taking aspirin, was never produced in discovery. Dr. Heintz's office advised that they could not locate it, At trial, Ms, Robertson testified that it was probably'located with other records at - one of the doctor’s homes, and that no one had gone there to look for it. . Ms. Robertson testified that their office sought surgical clearance from other doctors for patients' “all the time.” Likewise, Dr. Car-inder testified that as a routine matter, he is asked for surgical clearance for his patients, . Mrs. Cahanin testified, however, that she was present when Dr, Heintz visited with them immediately prior to the surgery, and that he never discussed postponement of the surgery for any reason. . Specifically, Dr. DeFatta testified: "Mr. Cahanin had suffered with polycythemia vera» for a while. Had he not suffered from that condition and undergone the surgery I don’t see any reason why he would have suffered that type of bleed that he did which resulted in his death because of the fact that the complication from Ae surgery resulted or stemmed from a natural disease process, which [is] why I ruled it as natural.” . Dr. Korndoffer, an expert surgeon who testified for Dr. Heintz, was also a member of the medical review panel. . At trial, only Dr. Daniel Frey, an expert witness for the defense, continued to assert that Mr. Cahanin may have suffered a PE that led to his death. As herein set forth, however, the record does not support a reasonable factual basis for Dr. Frey's opinion on this issue. . On this point, Dr. DeFatta specifically testified as follows: “This was a slow bleed. I couldn't tell you how many hours passed from the time he was discharged to home. There was something I would say took place over hours. This wasn't something that just happened all of a sudden and he bled out’within an hour. This took a little while.” , It is noted that a P.E, .which was originally suspected as the cause of death, is a large blood clot', and therefore is also a complication.for which a PV patient is at greater risk, . "Medically optimized” means that the treatment has placed the patient’s blood counts within normal ranges, thus reducing the attendant risks versus an untreated PV patient. . Dr. Gouge testified that surgery should not be performed on an untreated PV patient, as their risk of clots is approximately 50% greater than a non-PV patient, and the risk of bleeding is 30-45% greater. A treated patient has a 7-10% increased risk for both clots and bleeding, he testified, or in other words, 7-10 'times as great a risk as in a patient without ■ PV, a risk he called significant. . Dr. Carinder testified that his office receives requests to clear his patients for surgery "all the time.” Ms, Robertson with Dr.' Heintz’s office testified that their office also routinely consulted other doctors to obtain surgical clearance for patients. . Dr. Korndoffer testified that he had no personal knowledge of the nursing gtaff at the particular hospital where the surgery took place. . In Broussard v. Med. Protective Co., supra, 952 So.2d at 818-19, the record established that Mrs. Broussard feared for her cardiac health due to her extreme family history of the disease. She was extremely stressed during her stay in the emergency room, vomiting and suffering from diarrhea. She agonized in this fear, suffering from chest pain for over three hours. In that case, the court found that $50,000.00 was an appropriate award for the survival action. The record in this case shows that Mr. Cahanin’s pre-death fear and suffering were likely less and of shorter duration than the victim in Broussard. . Mrs. Cahanin addressed the issue of the appropriate amount of survival and wrongful death damages both in her motion for judgment notwithstanding the verdict and her appellate brief to this Court. Defendants’ opposition to the motion for judgment notwithstanding the verdict, as well as their appellate brief, fail to address the issue of damages or the issue of a reasonable damage award in this case. . Contained within the previously mentioned stipulation of Dr, Rice’s report, it was determined that Mr. Cahanin's life expectancy was an additional 15.58 years past the date* of-trial. . A thorough review of Louisiana jurisprudence reflects a wide range of wrongful death awards for spouses With marriages of a similar duration and closeness as die Cahanins. See for example, Moss v. State, 07-1686 (La. App. 1 Cir. 8/8/08), 993 So.2d 687, 704-07 (couple married for twenty-five years widi close and devoted relationship; award on appeal raised to $300,000.00 for surviving spouse as damages for husband’s wrongful death), and cases cited therein; and Newsom v. Lake Charles Mem'l Hosp., 06-1468 (La. App. 3 Cir. 4/4/07), 954 So.2d 380, 392-93 (couple married for thirty-five years, close and loving relationship; reversing a defense verdict, court of appeal would have awarded widow $250,000.00 in wrongful death damages—including stipulated medical, funeral, and burial expenses—but considering the $500,000.00 statutory cap, awarded the widow $166,666,67 and each of the five adult children $66,666,66 in wrongful death damages). Considering that these cases were decided more than ten years ago, we find that $400,000.00 is a current reasonable amount to award Mrs. Cahanin in general damages for her past and future loss of love, affection, and services occasioned by her husband's wrongful death, and is thus just and fair and supported by the evidence. . In light of our holding herein, we preter-mit any discussion of Mrs. Cahanin’s assignment of error challenging the denial of her motion for judgment notwithstanding the verdict. ‘